### 67612. MORAN v. THE STATE.

McMURRAY, Chief Judge.

Following a bench trial, defendant was found guilty of the felony offense of trafficking in cocaine and the misdemeanor offense of giving a false name to a law enforcement officer. He appeals from the judgment of conviction and sentence entered thereon. The defendant's challenges are to the denial of his motion to suppress the cocaine; the denial of his motion for a directed verdict on the cocaine trafficking charge; and the trial court's holding that it could not probate or suspend any part of defendant's sentence under OCGA § 17-10-1 (a) (formerly Code Ann. § 27-2502 (a)).

On October 8, 1982, at the Atlanta airport, Drug Enforcement Administration (DEA) Special Agent Paul Markonni (an experienced law enforcement officer) was observing passengers departing from a nonstop flight from Ft. Lauderdale, Florida (an alleged significant distribution city for cocaine, methaqualone and marijuana, which causes the DEA to pay particular attention to flights from that city). One of the passengers, Michael Frank Moran, initially attracted the agent's attention by appearing to stare directly at the agent at various times as he descended the airplane. Skeptical of Moran's actions, Markonni followed Moran from behind. As Moran received information from airline personnel in the concourse concerning his connecting flight, Markonni was able to observe Moran's airline ticket. Markonni observed that the ticket bore the name of "Terry Hindle" and was paid for with cash. Once this information was obtained, Markonni assumed his normal position behind the airline personnel. Still watching Moran as he walked towards the gate of his connecting flight, Markonni noticed that Moran "looked back at the area of the arrival gate twice turned over his shoulder and stared back at the people who were in the arrival gate area." With his suspicion further aroused, Markonni did some follow-up work on Mr. Moran.

From information gained from the reservation record, Markonni learned that "Terry Hindle's" reservation was made on October 7, 1983, approximately 20 hours before the scheduled flight departure. The reservation was for two flights, one from Ft. Lauderdale to Atlanta and the other, a connecting flight from Atlanta to Washington, D. C. Markonni also learned that the callback number given on "Hindle's" reservation record had been cancelled. This seemed odd to Markonni because in his experience "making reservations twenty hours in advance without a phone number is unusual unless the person is not travelling under [his] own name [or the person does not] want to be associated with a good telephone number." Based on this, Markonni twice tried to call the cancelled callback number, however, on both attempts he received no answer. At that point, Markonni decided to interview Moran.

Agent Markonni was dressed in "plain clothes" and was armed, but his weapon was not visible. Markonni approached Moran who was sitting at a departure gate awaiting the continuation of his flight to Washington, D. C. Markonni bent over the right side of the chair in which Moran was seated, and according to Markonni very quietly said, "I'm a police officer. Could I talk to you for a few minutes." Agreeing, Moran stood up and took about three or four steps out of the gate area into the concourse with the agent. At that point, Agent Markonni exhibited his DEA credentials and again identified himself (by saying "I'm a police officer") to Moran. On request Moran handed Markonni his airline ticket. While examining the ticket, Markonni asked Moran his name to which Moran responded, "Terry Hindle" (the name in which the ticket was issued). Markonni, after returning the ticket to Moran, asked for additional identification. As Moran fumbled through his wallet to get his driver's license, he said, "Well, Terry Hindle is my girl friend and I'm using her ticket." Moran then handed Markonni a driver's license bearing the name of "Michael Frank Moran." Markonni stated, "I thought you indicated your name was Terry Hindle," to which an increasingly nervous Moran responded, "Well, Terry Hindle is my girl friend and I'm using her ticket. I'm making this trip and I'm going to see my daughter in Virginia. She was going to go, but I'm doing it."

After handing the driver's license back to Moran Markonni told Moran that he "was looking for drugs and narcotics coming through the airport, and . . . asked [Moran] if he would mind allowing [him] to conduct a very brief search of [Moran] and also [a] . . . piece of [his] checked luggage . . ." According to Markonni, Moran responded, "Well, you can search my suitcase." Markonni then stated, "Well would you mind, before we go to the trouble of getting your suitcase out . . . letting me search you?" Moran replied that he was not carrying any drugs. Markonni again stated, "Okay. Would you

mind letting me search you," to which Moran responded, "Well, I don't see why I have to be searched." To this, Markonni answered, "Well, you don't have to be searched. I'm asking your cooperation." Markonni then stated, "Is there something that you are concerned about?" Moran asserted that there was not and again stated, "I'm not carrying any drugs." Markonni again asked, "Well, do you mind letting me search you for drugs?" Moran replied, "No, I don't mind, but I'm not carrying any drugs." Markonni stated, "Well, if you don't mind, we can either do it right here or we can walk down the hall to [the airline's] office and do it down there." Moran stated his preference for the office. As Markonni and Moran proceeded to the office, Moran asked Markonni "why [he] approached him and why he had to be searched?" Markonni testified that he kept telling him (Moran) that he did not have to be searched and that he was asking for his cooperation. Finally, Moran asked, "Am I under arrest?" Markonni said, "No, you are not under arrest . . . You don't want to be under arrest, do you?" Moran replied, "No."

As Markonni and Moran arrived at the airline's office (which was about 100 to 120 feet from where Markonni had first interviewed Moran) and walked inside, Moran continued to say, "I don't know why I have to go through with this." It being obvious to Markonni that Moran was not overly excited about being searched, he finally said, "Look, the bottom line is, you know, will you consent to allow me to search you or do you not want me to search you?" At that point, Moran "just raised his arms and [Markonni] . . . went ahead and searched him."

In a pocket on the right side of Moran's shirt, Markonni discovered a small yellow, plastic container. Inside the container was a "white powder substance" which Markonni testified "had the appearance and odor of cocaine." At the time of this discovery, Markonni placed Moran under arrest, handcuffed him, and continued the search. The search revealed a larger quantity of "suspected cocaine in three bags . . . under [Moran's] clothing in the front of his body in his lower abdomen area." All the "white powder substance" and "suspected cocaine" found later tested to be approximately 81 grams of cocaine. *Held*:

1. Defendant initially contends the trial court erred in denying his motion to suppress the cocaine. He argues that Agent Markonni's actions constituted an illegal "seizure"; that the "seizure" was not based upon reasonable and articulable suspicion that he was engaged in criminal activity; and that the search was without his free and voluntary consent. Pretermitting the issue of whether the defendant consented to the search, we find that defendant's contention is without merit.

In determining whether a given contact between a police officer

and a citizen violated a defendant's Fourth Amendment rights, the court must first determine whether the encounter was a "seizure" within the meaning of the Fourth Amendment. See United States v. Mendenhall, 446 U. S. 544, 553 (100 SC 1870, 1876, 64 LE2d 497) (1980) (Stewart, J.) (with Rehnquist, J., concurring). The Fourth Amendment's proscription against unreasonable searches and seizures governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest. Davis v. Mississippi, 394 U. S. 721 [89 SC 1394, 22 LE2d 676] (1969); Terry v. Ohio, 392 U. S. 1, 16-19 [88 SC 1868, 20 LE2d 889] (1968)." United States v. Brignoni-Ponce, 422 U. S. 873, 878 (95 SC 2574, 45 LE2d 607). "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' [Cit.]" United States v. Mendenhall, supra at 553-554. In distinguishing between an intrusion amounting to a "seizure" of the person and an encounter that intrudes upon no constitutionally protected interest, we adopt that standard proposed by Justice Stewart in United States v. Mendenhall, supra at 554: "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

Under the facts of this case, the trial court was justified in concluding that defendant was not "seized" at the initial encounter when the DEA agent questioned the defendant on the concourse. See United States v. Mendenhall, 446 U. S. 544 (II-A), supra; State v. Reid, 247 Ga. 445 (276 SE2d 617); McShan v. State, 155 Ga. App. 518 (1), 519 (271 SE2d 659). The court was also justified in finding that when defendant gave the DEA agent "Terry Hindle" as his name, the agent was involved in an official investigation and the defendant knew of the agent's law enforcement status. At this point, the agent knew that the misdemeanor offense of giving a false name to a law enforcement officer, in violation of OCGA § 16-10-25 (formerly Code Ann. § 26-2506), had been committed in his presence and as such, could properly arrest the defendant. (Traditionally, a police officer need not obtain an arrest warrant when a misdemeanor is committed in his presence. See, e.g., John Bad Elk v. United States, 177 U. S. 529, 535 (20 SC 729, 731, 44 LE 874) (1900).) Accordingly, we agree with the trial court that the defendant's giving of the false name to the DEA agent constituted probable cause for the arrest and that "[i]ncident to that lawful arrest, the officer had the right to search contemporaneously the full person of the arrestee. [Cit.]" Berry v. State, 163 Ga. App. 705, 708 (294 SE2d 562). In regard to " '[w]here the formal arrest followed quickly on the heels of the challenged search of (defen-

dant's) person [as here], we do not believe it particularly important that the search preceded the arrest rather than vice versa.' [Cit.]" *Berry v. State*, supra, at 709 (2).

Moreover, even assuming arguendo that the search was not incident to a valid arrest, we find that the evidence in the record was sufficient to justify the trial court's conclusion that the consent to search was voluntarily given. Accordingly, the trial court did not err in refusing to grant defendant's motion to suppress the cocaine.

2. The indictment charged defendant with "trafficking in cocaine for that [the] said [defendant] . . . was knowingly in actual possession of, with intent to distribute in excess of 28 grams of cocaine . . ." The offense of "trafficking in cocaine" is proscribed by OCGA § 16-13-31 (formerly Code Ann. § 79A-811) which provides, in pertinent part: "Any person . . . who is knowingly in actual possession of 28 grams or more of cocaine . . . commits the felony offense of trafficking in cocaine . . ."

In the instant case the State proved that defendant was knowingly in actual possession of in excess of 28 grams of cocaine. However, the State introduced no evidence as to defendant's "intent to distribute." As such, defendant contends that the trial court erred in denying his motion for directed verdict of acquittal since the State did not prove the averments as charged in the indictment. We do not agree.

For defendant to be convicted of the offense of "trafficking in cocaine," the State need only show that he was knowingly in actual possession of 28 grams or more of cocaine. There is no requirement in the statute that the State either allege or prove that defendant had an intent to distribute the cocaine. Thus, the inclusion by the State of "with intent to distribute" in the indictment was mere surplusage. See *Dockery v. State*, 95 Ga. App. 486, 487 (1) (98 SE2d 123) and cases cited on page 487; *DePalma v. State*, 225 Ga. 465, 469 (3), 470 (169 SE2d 801); *Dobbs v. State*, 235 Ga. 800, 801-803 (3) (221 SE2d 576).

Defendant further contends that although the indictment charged him with "trafficking in cocaine," it actually described a violation of OCGA § 16-13-30 (formerly Code Ann. § 79A-811) which provides, in pertinent part: "[I]t is unlawful for any person to . . . possess with intent to distribute any controlled substance." To this end, defendant argues that merely labelling the offense "trafficking in cocaine" was not sufficient to put him on notice of the offense he was charged with since the indictment described a wholly different offense. Defendant's contention is without merit.

" 'An indictment substantially in the language of the Code is sufficient in form and substance.' [Cit.]" *Wages v. State*, 165 Ga. App. 587, 588 (2) (302 SE2d 112). In this regard, " '[t]he true test of the

sufficiency of the indictment is not "whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' " [Cit.]' [Cit.]" *Wages v. State*, supra at pages 588-589.

In the instant case the indictment is sufficient in form and substance. It contains the elements of the offense intended to be charged; it sufficiently apprises the defendant of what he must be prepared to meet; and it is substantially in the language of the "trafficking in cocaine" statute (i.e., OCGA § 16-13-31). Moreover, even assuming arguendo that the form of the indictment was defective, this defect was waived since defendant did not raise it prior to trial. See *Hopper v. Hampton*, 244 Ga. 361, 362 (260 SE2d 73); *Williams v. State*, 162 Ga. App. 350, 351 (291 SE2d 425); *Staton v. State*, 165 Ga. App. 572 (1) (302 SE2d 126).

3. Lastly, defendant contends that the trial court erred in finding that it could not probate or suspend any part of defendant's sentence under OCGA § 17-10-1 (a) (formerly Code Ann. § 27-2502 (a)), but that his sentence had to be five years in confinement and a $50,000 fine. We disagree. OCGA § 16-13-31 (e) (formerly Code Ann. § 79A-811 (m)), by its express terms, requires a mandatory minimum sentence and is removed from the application of OCGA § 17-10-1 (a). Accordingly, the trial court was correct in finding that it could not probate or suspend any part of defendant's sentence under that statute. See *Knight v. State*, 243 Ga. 770, 772 (2), 773, 774 (257 SE2d 182).

*Judgment affirmed. Deen, P. J., and Sognier, J., concur.*

DECIDED MAY 7, 1984.

*Steven H. Sadow*, for appellant.
*Robert E. Keller, District Attorney, William L. McKinnon, Jr., Assistant District Attorney*, for appellee.