74222. LOPEZ v. THE STATE.
74223. OYOLA v. THE STATE.
(360 SE2d 722)

DEEN, Presiding Judge.

Jose Luis Lopez and Ruben Oyola were jointly tried and convicted by a jury of trafficking in cocaine. Each has filed a separate appeal.

On June 9, 1986 Lopez and Oyola were en route from Miami to Chicago when they were stopped on I-75 in Gordon County at 6:45 a.m. by Georgia State Patrol Trooper M. S. Ralston, who told them their automobile had either a dim or nonfunctioning taillight. Lopez was a 21-year-old native of Puerto Rico with a tenth grade education who spoke very little English. The automobile belonged to his cousin, Miguel Quieles, a Miami resident, who had loaned him the car to visit Chicago. Oyola, also a native Puerto Rican, was 37 years old, a college graduate, bi-lingual and had a background of jobs in social services and as a consultant to police and government agencies in the human relations and community organization fields. He had also worked as an insurance and private investigator. He testified that Quieles had hired him at his daily rate as an investigator ($25 per hour or $250 per day, plus expenses) to accompany Lopez because he was familiar with Chicago and the route to take, and that he was planning to fly back after they arrived because he had previously made plans and purchased the tickets to visit his father in Puerto Rico over Father's Day weekend. He and Lopez started out between 5:00 and 6:00 p.m. the day before, and he had driven until shortly before the car was stopped in Gordon County.

Trooper Ralston asked for Lopez' driver's license and the automobile registration, which Lopez produced, and verified them as valid. He then spoke to Oyola and questioned both men as to their destination and starting point. After issuing a warning for the mechanical defect he radioed the Sheriff's Department for a backup, and asked if the men would consent to his searching the car. Both agreed orally, and Lopez also read and signed a Florida Highway Patrol consent to search form printed in Spanish. Both men unlocked their luggage voluntarily while the car and trunk were being searched and were in Trooper Ralston's words "very cooperative." Trooper Ralston then removed a plastic vent on each of the vehicle's doorjambs, thereby discovering in the left rear quarter panel five packages of a white powder, subsequently analyzed to contain over ten pounds of 75% pure cocaine. Appellants, although they professed no knowledge of the cocaine, were arrested, indicted, tried and convicted of being in actual possession of cocaine in violation of OCGA § 16-13-31 (a). *Held*:

1. Both Lopez and Oyola contend that the trial court committed

reversible error in denying their motions to suppress illegally seized evidence. The dispositive issue is whether Lopez and Oyola consented to the search of the vehicle freely and voluntarily, and not as a result of coercion, duress, or deceit. *State v. Rezvani*, 181 Ga. App. 328 (352 SE2d 197) (1986). We conclude that the totality of the circumstances supported the trial court's determination that both Lopez and Oyola freely and voluntarily consented to the search, and the trial court thus properly denied the motions to suppress.

The state trooper was justified in stopping the vehicle, as it had an improperly functioning taillight. Thereafter, the officer was given express consent by both Lopez and Oyola to search the automobile. Consent was even given to open a briefcase by forcing it open. The trooper removed the plastic vent on the door-jambs by removing one screw, and then was able to see the packages of cocaine hidden in the left rear quarter panel of the car. The door paneling was dismantled only after the cocaine was already detected, and then only because it was necessary to retrieve the cocaine.

Here, the trooper testified that what he did in this case was in keeping with what he had learned at a Drug Enforcement Agency seminar related to narcotics trafficking. He testified that in the past he had stopped around 40 cars that he had thought suspicious under the "drug courier profile." He stated further that out of those stops, everyone stopped had *consented* to a search of the vehicle and 14 or 16 drug trafficking cases had resulted.

The trial court has a discretion under all the facts in deciding questions of suppression of evidence. We cannot say as a matter of law that the search was overly intrusive. Therefore, the trial court's decision not to suppress the evidence, based on the totality of the circumstances, is affirmed.

2. Oyola contends that the evidence was insufficient to support his conviction. Oyola's explanation was that his involvement was only a matter of employment. Quieles and Lopez were cousins; both wanted to go to Chicago, Quieles for business purposes and Lopez for vacation (although at one time Lopez stated his purpose was to look for a better job). Quieles intended to fly to Chicago and have Lopez drive his car and meet him there. Because Lopez was not proficient with the English language and did not know the route to Chicago, Quieles had hired Oyola to accompany Lopez, agreeing to pay Oyola at his regular private investigator's rate of $250 per day. Quieles had tendered the keys to his car actually to Oyola, and not Lopez. Upon their arrival in Chicago, Oyola intended to visit his brother for a day or two and then fly to San Juan, Puerto Rico, to look for his estranged father.

Despite our efforts to view this proffered explanation of events as reasonable, we still find it farfetched that Oyola would be employed

to provide a service that could have been accomplished with a mere road map. The web of circumstantial evidence adduced authorized a rational trier of fact to find Oyola guilty beyond a reasonable doubt, and that body of evidence did not have to exclude the incredible hypothesis proposed by Oyola. *Robinson v. State*, 168 Ga. App. 569 (309 SE2d 845) (1983).

"If he is not guilty, he is an unfortunate wretch in the grip of most merciless circumstances. We are willing to take the word of the jury for his guilt, based on these circumstances, and leave the case as we find it. It is not the strongest, but strong enough." *Wilson v. State*, 55 Ga. 324, 325 (1875).

3. We have considered the remaining enumerations of error in both appeals and find them to be without merit.

*Judgments affirmed. Birdsong, C. J., McMurray, P. J., Banke, P. J., Sognier and Beasley, JJ., concur. Carley, J., concurs in the judgment only. Pope and Benham, JJ., dissent.*

POPE, Judge, dissenting.

While the Georgia Supreme Court has recognized that " 'the [S]tate can practice preventive therapy by reasonable road checks to ascertain whether man and machine meet the legislative determination of fitness,' " it further warns that such stops "should not be used as a subterfuge to detain citizens for the purpose of searching their automobiles when they are under no founded suspicion." *Brisbane v. State*, 233 Ga. 339, 343 (211 SE2d 294) (1974). I am troubled in the instant case by the lack of an underlying "founded suspicion" motivating both the stop and the overzealous search of appellants' car.

"The United States Supreme Court has held that 'when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.' *New York v. Belton*, 453 U. S. 454, 460 (101 SC 2860, 69 LE2d 768) (1981)." *Oswell v. State*, 181 Ga. App. 35 (351 SE2d 221) (1986); *Coley v. State*, 177 Ga. App. 669 (1) (341 SE2d 9) (1986). Here, according to Trooper Ralston's testimony, there was no custodial arrest, lawful or otherwise, preceding the search. Moreover, since the evidence showed that sunrise had occurred over an hour before appellants were stopped because of the allegedly malfunctioning taillight (so there was no real need to drive with headlights and only about half the cars on the highway were using them at that time), the question arises as to whether the traffic stop was actually only a pretextual reason to justify a search and seizure under the Fourth Amendment.

"Although an officer may conduct a brief investigative stop of a vehicle, see *Delaware v. Prouse*, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979), such a stop must be justified by specific, articulable facts

sufficient to give rise to a reasonable suspicion of criminal conduct, *Terry v. Ohio*, 392 U. S. 1, 27 (88 SC 1868, 1883, 20 LE2d 889, 909) (1968); *United States v. Brignoni-Ponce*, 442 U. S. 873 (95 SC 2574, 45 LE2d 607) (1975). Investigative stops of vehicles are analogous to *Terry*-stops, *Terry*, supra, and are invalid if based upon only 'unparticularized suspicion or "hunch," ' 392 U. S. at 27 . . .'' *United States v. Smith*, 799 F2d 704, 707 (11th Cir. 1986). "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. We have repeatedly held that an authorized officer may stop an automobile and conduct a limited investigative inquiry of its occupants, without probable cause, if he has reasonable grounds for such action — a founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing." (Citations and punctuation omitted.) *Coley v. State*, 177 Ga. App. at 670, supra. See also *Smith v. State*, 165 Ga. App. 333 (1) (299 SE2d 891) (1983).

In the instant case Trooper Ralston testified on cross-examination that after checking Lopez' driver's license and the car's registration (both of which were valid) he decided to search the car and radioed for backup assistance. When asked what information he had that aroused his suspicion concerning appellants he replied: "Conflicting statements, characteristics — . . . At one period of time there was a conflict between who had authorization or who had consent from the cousin of defendant Lopez to drive the car, to take the car." Asked what other factors he considered, Trooper Ralston answered: "Two persons traveling north from a distribution center, Miami. . . ." However, he admitted he did not search every car from Miami. Although he could not remember what job Lopez had told him he had, Trooper Ralston had some doubts as to Lopez' ability to be able to afford a vacation. He also noted that the automobile was registered to a third party, and that appellants were traveling together, although they had known each other only three weeks, to a destination that one of the persons was totally unfamiliar with. However, there were no physical acts by appellants, such as nervousness or hesitation in responding to his questions, which led him to believe they were narcotics traffickers.

Upon further cross-examination, Trooper Ralston explained that he had learned at a Drug Enforcement Agency seminar two months

earlier what factors and characteristics to look for in narcotics trafficking; that since that time he had stopped between 35 and 40 vehicles he considered suspicious under the "drug courier profile," most of which were apparently operated by blacks and Hispanics; that out of those stops he had made 14 or 16 drug trafficking cases; and that everyone stopped had consented to a search of the vehicle.

In my view, the "suspicious" characteristics cited by Trooper Ralston, based on the vaguest of "profiles," are so negligible as to be nonexistent. In contrast, the airport drug courier profile is held to a much more encompassing standard of suspicious actions. See, e.g., *Conley v. State*, 180 Ga. App. 662 (350 SE2d 45) (1986); *Moran v. State*, 170 Ga. App. 837 (318 SE2d 816) (1984); *Berry v. State*, 163 Ga. App. 705 (294 SE2d 562) (1982); *United States v. Berry*, 670 F2d 583, 598-600 (5th Cir. 1982). Other cases where there were consensual searches following automobile stops which were not based on a drug courier profile have either involved much more suspicious behavior prior to the stop and search than that encountered here, or did not go further than the seizure of evidence in plain view in the vehicle or from the defendant's person or personal effects. See, e.g., *Minor v. State*, 180 Ga. App. 869 (1) (350 SE2d 783) (1986); *Wilson v. State*, 179 Ga. App. 780 (1) (347 SE2d 709) (1986); *Anderson v. State*, 177 Ga. App. 130 (2) (338 SE2d 716) (1985).

Moreover, where the arrest is "based on the search rather than vice versa, the issue of whether the arrest was lawful is not determinative of the legality of the search. Rather, the issue is whether [the] consent was lawfully obtained . . . and not as a result of coercion, duress, or deceit. . . . Such determinations are to be made from the totality of the circumstances under which the consent is given. *Schneckloth v. Bustamonte*, 412 U. S. 218, 227 (93 SC 2041, 36 LE2d 854) (1973)." (Indention omitted.) *State v. Rezvani*, 181 Ga. App. 328, 329 (352 SE2d 197) (1986). "In *Schneckloth*, [supra], the Supreme Court made an extensive explication of the concept of 'consent' in the Fourth Amendment context. *Schneckloth* teaches that, in essence, consent is without coercion; and to determine whether consent is free, the totality of circumstances surrounding the request for and agreement to the search must be examined. Though the giving of consent to make a search may be seen as waiving a person's Fourth Amendment rights, such a waiver should not be governed under the strict standards applied to waiver of other constitutional rights." (Citations omitted.) *Mason v. Pulliam*, 557 F2d 426, 428 (5th Cir. 1977).

I am unable to agree with the conclusion of the majority that the totality of the circumstances supported the trial court's determination that appellants freely and voluntarily consented to the scope of the search carried out here or that the request to search was reasonably induced. In my view, Trooper Ralston had at best only a marginal

basis to stop appellants' car for a traffic violation, and the factors cited by him were insufficient to give rise to a "founded suspicion" of drug activity. As stated by the Eleventh Circuit Court of Appeals in *United States v. Smith*, supra, which I find equally applicable in this case as in *Smith*: "While the factors noted by Trooper [Ralston] might have some statistical correlation to characteristics of drug couriers, they are also descriptive of numerous legitimate interstate travelers. Whether other factors contained in the profile might sufficiently distinguish drug couriers from other travelers we do not today consider." 799 F2d at 708 n. 5. That is because such other factors were neither alleged nor shown in either case. Although the stop in *Smith* was determined to be devoid of probable cause because the trooper's suspicion was roused by that defendant's failure to look in his direction when he passed the patrol car, I consider the ostensible reason for the stop of appellants' car here to be similarly pretextual, and the extent of the subsequent search of the car so unreasonably based as to nullify any consent given by appellants. Their actions subsequent to the stop in no way gave rise "to a *reasonable* suspicion of illegal activity either alone or in combination with the other circumstances surrounding the stop of appellants' car. Trooper [Ralston] stopped the car because the appellants matched a few nondistinguishing characteristics contained on a drug courier profile and, additionally, because [they were driving in daylight hours with a dim or malfunctioning taillight]. [Ralston's] suspicion therefore was not the result of 'reasonable inferences' from 'unusual conduct,' *Terry*, [supra], but was instead a classic example of those 'inarticulate hunches' that are insufficient to justify a seizure under the [F]ourth [A]mendment. [Cit.]" 799 F2d at 707.

It appears obvious that but for such a hunch, a reasonable search of appellants' car would not have entailed dismantling the doors. In determining whether an investigative stop and consensual search pursuant thereto are invalid as pretextual, I would follow the *Smith* court's standard that "the proper inquiry is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." Id. at 708. Likewise, in *United States v. Cruz*, 581 F2d 535, 540-542 (5th Cir. 1978), the Fifth Circuit held a stop made to issue a warning for a surmised u-turn to be an unreasonable seizure under the Fourth Amendment because its purported rationale was merely a pretext for an invalid purpose, in that the deputy did not really stop the car for a possible traffic violation, but instead was "hunting for illegal aliens and stopped [the] automobile in order to inspect its occupants." Id. at 542. See also *Rohrig v. State*, 148 Ga. App. 869 (253 SE2d 253) (1979), in regard to a constitutionally reasonable inventory search.

Here, as in the cases discussed, I believe the stop was unreasona-

ble not because Trooper Ralston "secretly hoped to find evidence of a greater offense, but because it was clear that an officer would have been uninterested in pursuing the lesser offense absent that hope." 799 F2d at 710. In light of appellants' legitimate possession of the car and their cooperation and lack of nervousness in consenting to a routine search of the car, the relentless search which ensued was obviously motivated by the hope of finding drugs based solely on Ralston's profile-inspired hunch. "By looking to what a reasonable officer *would* do rather than to what an officer validly *could* do, the standard [I would] apply today to determine the validity of an allegedly pretextual investigative stop is supportive of the rationales that make *Terry*-stops reasonable under the [F]ourth [A]mendment. *Terry*-stops are reasonable not only because of the government's interest in investigating and alleviating officers' suspicions of illegal activity but also because of the limited intrusiveness of such stops. [Cit.] To maintain this balance between the competing interests of the government and the individual, each *Terry*-stop must be both 'justified at its inception' and 'reasonably related in scope to the circumstances which justified the interference in the first place.' [Cits.]" Id. at 711.

I find that neither of these standards was evidenced here, that the search and seizure were arbitrary and harassing, and, consequently, unreasonable under the Fourth Amendment. Thus, in my view appellants' motions to suppress were improperly denied. Accordingly, I respectfully dissent.

I am authorized to state that Judge Benham joins in this dissent.

DECIDED JULY 14, 1987 —
REHEARING DENIED JULY 31, 1987 —

*Miguel A. Orta, Fernando Garcia*, for appellant (case no. 74222).
*J. Lane Bearden, Joseph P. Quirk*, for appellant (case no. 74223).
*Darrell E. Wilson, District Attorney*, for appellee.