## 77574. O'KEEFE v. THE STATE.
(376 SE2d 406)

BIRDSONG, Chief Judge.

The appellant, Donald J. O'Keefe, brings this appeal from his conviction for trafficking in marijuana. On the evening of October 21, 1986, Deputy Sheriffs Brooks Lansing and Jimmy Howell, members of the Whitfield County DUI Task Force, were observing northbound traffic on I-75, when Lansing saw O'Keefe's vehicle come by their location and he thought the car crossed over the centerline. Howell saw O'Keefe's car cross over the line on the right side as it was going around the curve. Howell testified that he told Lansing: "I believe we

need to go check that one. I believe it's a DUI." The officers followed O'Keefe's car and saw it cross over the centerline twice. Howell stated: "all of a sudden he just swerved over one lane and back in the other lane; and we actually thought that Mr. O'Keefe was driving like he'd been drinking. . . ." As Lansing left his car, O'Keefe exited his vehicle hollering: "4-1 New York." Officer Lansing did not understand what O'Keefe was saying and asked him if he was going to New York and O'Keefe explained that he was telling him the score of the World Series.

Lansing testified that O'Keefe "was very nervous. He kept fidgeting around. . . . He was waving his arms somewhat as he was talking. . . . As Officer Howell approached the car, he got even more nervous. I later walked up to the car, and we smelled some type of odor. I could not determine whether it was alcohol or not. It was a strange odor. I really never had any contact with it before." They asked O'Keefe where he was going and he could not give them a location other than outside of Chattanooga to a town he did not know the name of—but was near a military academy. Howell observed that "[t]here were too many suspicious things about him and the car." He saw tire-tools and clothes in the back seat, "it just seemed out of the way." Officer Howell smelled the strange odor and thought it might be alcohol. They gave O'Keefe an "Alco-Sensor" test and it was "zero/zero." O'Keefe was placed under arrest for improper lane usage and was told they were going to take him to the Correctional Center and he could made bond there. Lansing said that at first O'Keefe refused and requested that he be given a ticket right then. They asked for permission to search his car and he refused. Another officer had been called and arrived on the scene. The officers directed O'Keefe to follow them to the Correctional Center. When they were leaving the scene, Officer Lansing called the radio dispatcher to have a drug dog at the Center to search around the car.

It took the officers approximately 15 minutes to arrive at the Correctional Center. Officer Howell took O'Keefe into the rear portion of the jail and realized that he did not have his ticket book and had to go to his car to get it. When he returned, he made out the ticket and turned O'Keefe over to the Booking Officer. The Booking Department as a practice takes a bond from the offender and turns him over to the Identification Section. The officer in charge of ID said she was on the phone, long-distance, when O'Keefe came in; after she finished her call, she started processing O'Keefe. Because the trial judge requires a "history" of a traffic offender in cases brought before him, a personal history statement was taken, then a photograph, and finally O'Keefe was fingerprinted. She testified this was routine procedure for minor traffic violators who were non-residents. Officer Howell testified that after he made out the traffic ticket and turned O'Keefe

over to Booking, he walked out of the building and was told that the drug dog had alerted on O'Keefe's car.

Officer Lansing was assisted in making out his affidavit and making a request for a search warrant. A magistrate was called to the Correctional Center and swore the officers, heard the evidence, and issued a search warrant for O'Keefe's car. Officer Howell served O'Keefe, who was still in the Center, with the warrant. He took O'Keefe's keys, opened the trunk of the car, and nine pillowcases full of a leafy green material was discovered. Subsequent examination identified the substance as marijuana. O'Keefe appeals from his conviction before the judge without a jury. *Held*:

1. Appellant alleges the initial stop of the appellant's car was "a pretextual stop based upon an impermissible 'drug courier profile.' " Evidence was introduced to show that the Federal Drug Enforcement Administration had initiated a plan called "Operation Pipeline" and sponsored a seminar in Georgia which was attended by law enforcement personnel. The purpose of the operation was to deploy trained and reinforced patrols along I-75 and I-95 in Georgia specifically targeting drug and narcotics "mules" transporting drugs from Florida to northern distribution points. A drug courier profile was formulated and included such characteristics as northbound cars with Florida license plates, particularly those with rental plates (bearing the letter "Z"). Another characteristic was to look at the back seat of the car for items usually carried in the trunk. Officers were told *not* to stop a car solely on the use of this profile. In Georgia, the State Patrol initiated "Operation Nighthawk" to perform surveillance on I-75 and I-95. Officers Lansing and Howell had attended a lecture given by Trooper Mickey Little of the Georgia State Patrol on the drug courier profile for automobiles. The record of Trooper Little was admitted in evidence to show that after he attended a seminar on Operation Pipeline by the DEA, his percentage of Florida cars stopped for traffic violations increased dramatically. Appellant introduced evidence to show that Officers Lansing and Howell stopped three cars on the evening of October 21. All three cars had Florida license plates.

Officer Lansing stated this his primary purpose of being on patrol that evening was DUI, not drug interdiction. Although he saw the Florida tag before he stopped the vehicle, it was a traffic stop. The trial judge questioned Lansing on whether O'Keefe was stopped for a traffic offense, or because of any kind of profile or characteristics of a drug courier and he responded: "That was the reason of the initial stop, yes sir, was the Improper Lane Usage." But the officer admitted he did not forget about the drug courier profile, and when he saw the Florida tag, the nervousness of the driver, the "junk" in the rear seat of his vehicle, his inability to tell them where he was going, and smelled the strange odor emanating from the car, he decided that he

would have the car "sniffed" by a drug dog.

Howell admitted he was concerned when pulling over cars for traffic offenses when they had a Florida tag, because "somebody carrying quite a large bit of Cocaine or marijuana, there's a possibility they could be armed and dangerous." However, he was a member of the DUI Task Force, he was on DUI patrol and their primary purpose that night was "DUIs . . . not drug interdiction. . . . We actually felt like he was a DUI."

Hence, there was evidence that both officers had been trained in Operation Nighthawk and use of the drug courier profile for cars. But both officers denied using the profile to stop O'Keefe's car. Instead, they testified that the initial impetus to follow the car resulted from his crossing the traffic lanes and after following O'Keefe for one and one-half to two miles and observing him "swerve" over the centerline once and cross it twice, they "felt like he was a DUI." The stop of O'Keefe's vehicle was authorized if the officers saw a traffic offense committed in their presence. *Hartley v. State*, 159 Ga. App. 157, 158 (282 SE2d 684); *Kilgore v. State*, 158 Ga. App. 55 (1) (279 SE2d 239). The evidence was sufficient for a rational trier of fact to find that the appellant committed the offense of improper lane usage beyond a reasonable doubt. *Eisenberger v. State*, 177 Ga. App. 673, 674 (1) (340 SE2d 232). At issue is whether the officer's testimony was credible or whether the circumstantial evidence as to the drug courier profile predominated.

"On appeal from the denial of a motion to suppress evidence obtained through a search that the defendant contends was illegal, 'the trial court's decision on questions of fact and credibility . . . must be accepted unless clearly erroneous.' " *State v. Harris*, 246 Ga. 759 (1) (272 SE2d 719). The trial court's findings of fact and credibility are not clearly erroneous. This enumeration is without merit.

2. It is alleged that it was error to deny the motion to suppress "since no reasonable or articulable suspicion existed for such detention" of the appellant and his automobile. We have found no illegal detention of appellant or his automobile. The initial stop was made because of observation of a traffic offense committed by O'Keefe. Officers Lansing and Howell testified as to their routine procedure in stopping and arresting out-of-state drivers for traffic offenses. Both officers said that they routinely took out-of-state offenders to the Correctional Center, booked them, let them post bond, and released them. Officer Lansing testified that "department policy dictates that anytime an out-of-state motorist is written a citation in Whitfield County he is to be issued the citation there *at the Center* . . . he will post a cash bond there, or have a property signed—bond signed by a bondsman; and then [is] free to leave there from the Center." (Emphasis supplied.) This policy was given to him by "a superior officer."

Officer Howell said the only reason for taking O'Keefe to the Correctional Center was to require him to post bond. He always wrote the ticket at the station, then turned the offender over to Booking. Bond is posted and Booking turns the man over to the ID section where a history is taken, and the offender is photographed and fingerprinted. When Howell finished making out the ticket, he had O'Keefe sign it and he left O'Keefe in Booking and walked away. As he left the station, he was told that the drug detection dog had alerted on O'Keefe's car. He told no one to delay the booking procedure to permit the dog to search. The personnel in Booking and ID stated that they were not asked to delay processing O'Keefe until his car could be searched by the dog.

Hence, there was no detention of O'Keefe or his automobile except to issue him a traffic citation and process him through Booking and ID. He was required to drive his car to the Correctional Center in accordance with standard procedure for booking out-of-state motorists and requiring them to post bond. The officers are not permitted to take a bond from a traffic offender and bond is necessary to assure appearance of out-of-state offenders for trial, or, the traffic offender may forfeit his bond by failing to appear for trial.

Appellant contends this procedure is a subterfuge for detaining a suspected drug courier's automobile until it can be "sniffed" by a drug detection dog. Appellant introduced a copy of an Executive Order, signed by Governor Busbee in 1979 in which he agreed for the State of Georgia to become a member of the Nonresident Violator Compact of 1977 (Compact), in which out-of-state motorists who are traffic offenders are permitted to proceed on their way, without posting bond or depositing their license. Appellant argues that this "Compact" was in effect between member states at the time of O'Keefe's arrest and "[t]he 'Compact' mandates that the police officers 'shall not . . . require the motorist to post collateral to secure appearance' for the charge of improper lane use. . . ." We do not agree with appellant's interpretation of the Compact as a "mandate."

There are several code sections which apply to this issue. In OCGA § 40-13-53 (a), the officer who issues a traffic citation—except for certain listed offenses not here applicable, "shall permit such person to be released upon being served with a citation and complaint and agreeing to appear . . . unless such officer has reasonable and probable grounds to believe that the person will not obey such citation and agreement to appear." This code section is directed to officers dealing with persons resident in Georgia and does not attempt to cover out-of-state traffic offenders, per se. Of course, it can be argued that the fact that a traffic offender resides out-of-state provides "reasonable and probable grounds to believe that the person will not obey such citation. . . ." In addition, our Code also provides that the

officer issuing a traffic citation "in lieu of being immediately brought before the proper judicial officer to enter into a formal recognizance . . . may, upon agreement with the arresting officer, deposit his chauffeur's or driver's license with the officer in lieu of bail. . . ." OCGA § 17-6-11 (a). Subsection (c) of this statute authorizes the public safety commissioner to promulgate "reasonable rules and regulations to carry out the purposes of this Code section and to establish agreements with other states whereby a valid license from that state may be accepted for purposes of this Code section." A review of the Official Rules and Regulations of the Public Safety Department reveals that this section has not been implemented. Further, the interstate Compact cites the procedure where "the motorist's driver's license is deposited as collateral" and emphasized this practice "is viewed with disfavor. . . ." Additionally, the officers in the instant case did not "agree" to take O'Keefe's license as collateral, but cited standard procedure required the out-of-state traffic offender be taken to the Correctional Center and bonded.

Such interstate agreement is also permitted by OCGA § 40-2-91, but that type agreement "shall be subject to confirmation by . . . the General Assembly. . . ." OCGA § 40-2-92. If the agreement is entered into when the General Assembly is not in session, the Compact "shall be submitted by the [Public Safety] commissioner to the General Assembly not later than the tenth day of its next session" for confirmation or rejection. OCGA § 40-2-93. This executive order was signed in 1979 and the Georgia Laws for 1980 and 1981 do not reveal any action taken by the General Assembly on this agreement. The Whitfield County magistrate had never heard of it and the officers involved had never followed the policy enunciated in the Compact. The evidence submitted to the court established the officers in this instance followed their routine procedure for booking and bonding an out-of-state traffic offender, and we find no unlawful detention of the appellant or his automobile.

3. The last enumeration of error alleges the "protracted bonding procedures . . . was a pretext to subject Defendant and his automobile to an unlawful search." Division 2, hereinabove, answers that portion of this enumeration claiming the bonding procedure was pretextual. In such matters, which were denied by the officers participating in the arrest and booking of O'Keefe, the credibility of the officers, their explanation, and determination of the facts are issues for the trial court in the first instance, and on appeal "we are bound to accept the trial court's decision on questions of fact and credibility at a suppression hearing unless clearly erroneous." *Williams v. State*, 256 Ga. 609, 610 (351 SE2d 454). We have reviewed the evidence and the trial court's ruling, and do not find the ruling to be clearly erroneous. See *Fortner v. State*, 257 Ga. 46, 47 (354 SE2d 146).

Furthermore, we have found no "unlawful search." While O'Keefe was posting bond and going through the identification procedure, the drug detection dog arrived. His handler led him around the outside of the car and he "alerted" at the area where the seam is between the trunk lid and the car body. The magistrate was called and Officer Lansing submitted his suspicions, related above, to the magistrate along with the evidence of the trained drug detection dog alerting on the area near the trunk of O'Keefe's car. There was no physical intrusion by the dog or the handler into any portion of the car. The warrant was issued and 192 pounds of marijuana were found in the trunk of the car. Was the use of the drug detection dog, sniffing around the outside of O'Keefe's car illegal, and if not, did it provide sufficient probable cause for a search warrant?

The U. S. Supreme Court has stated that "[g]iven the enforcement problems associated with the detection of narcotics trafficking and the minimal intrusion that a properly limited detention would entail, we conclude that the Fourth Amendment does not prohibit [the temporary] detention" of a traveler's luggage for use of a trained drug detection dog. *United States v. Place*, 462 U. S. 696, 698 (103 SC 2637, 77 LE2d 110). "The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit." *United States v. Mendenhall*, 446 U. S. 544, 561 (100 SC 1870, 64 LE2d 497). The Supreme Court found "the canine sniff is *sui. generis*. . . . Therefore, we conclude that the particular course of investigation . . . exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment." *Place*, supra at 707. Our own Supreme Court, in *Bothwell v. State*, 250 Ga. 573, 579 (300 SE2d 126), U. S. cert. den. 463 U. S. 1210, considered the sniff of a trained drug detection dog on a suspect's luggage, and held that a passenger who has turned his luggage over to the airline "has no reasonable expectation of privacy in the air space surrounding the luggage; and that the use of a canine's enhanced olfactory sense to sniff for the presence of controlled substances in the luggage without opening the luggage does not constitute a search within the meaning of the Fourth Amendment."

Although case precedent in Georgia is sparse on the use of a trained canine to sniff the exterior of a container, federal authorities on this issue are many. The following are in agreement that use of a trained drug detection dog to sniff the outside of a closed container is not a search within the proscription of the Fourth Amendment. *United States v. Dicesare*, 765 F2d 890, 897 (9th Cir. 1985); *United States v. Waltzer*, 682 F2d 370, 373 (2d Cir. 1982); *United States v. MacDonald*, 670 F2d 910 (5) (10th Cir. 1982); *United States v. Johnson*, 660 F2d 21 (1) (2nd Cir. 1981); *United States v. Viera*, 644 F2d

509 (1) (5th Cir. 1981); *United States v. Goldstein*, 635 F2d 356, 361 (5th Cir. 1981); *United States v. Klein*, 626 F2d 22 (5) (7th Cir. 1980).

We hold that use of a trained drug detection dog, in a location where he is entitled to be, to sniff the exterior of a container, is not an unreasonable search within the meaning of the Fourth Amendment of the U. S. Constitution or Art. I, Sec. I, Par. XIII, of the Georgia Constitution of 1983. *Place*, supra; *Bothwell*, supra. The dog in the instant appeal was in a place where he was authorized to be. The container, O'Keefe's car, was not being unlawfully detained. The dog did not intrude into the interior of O'Keefe's car. The area around O'Keefe's car is not a area protected by the Fourth Amendment or Par. XIII of Art. I, Sec. I of the Georgia Constitution. The owner or driver of an automobile has no reasonable expectation of privacy in the airspace surrounding his car. The use by the officer of a canine's enhanced (through training) olfactory sense, cannot convert a sniff of the air around the exterior of a car into an unreasonable search of the interior of the car.

It is accepted law that what one knowingly exposes to the public cannot be the subject of a claim of Fourth Amendment protection. *Katz v. United States*, 389 U. S. 347, 351 (88 SC 507, 19 LE2d 576). Hence, knowingly exposing the odor of marijuana to the public, in a public place, cannot be the subject of a Fourth Amendment claim. Here, someone placed marijuana in appellant's car, presumably with full knowledge of its pungent odor and the fact that the identifiable odor of marijuana could emanate from the car and be detected outside the car. If the owner of marijuana does not desire to expose its odor to the public, then it is incumbent upon the owner to contain the odor within the car. In this instance, the odor of the marijuana did escape from the car and was detected outside the car, in an area where the drug detection dog was entitled to be, and where appellant had no reasonable expectation of privacy.

Odor as well as sight, hearing, taste or touch can be used in establishing probable cause. *Berry v. State*, 163 Ga. App. 705, 708 (294 SE2d 562). " 'If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of most persuasive character.' *Johnson v. United States*, 333 U. S. 10 (I) (68 SC 367, 92 LE 436)." *Berry*, supra at 708. This court has had more opportunities to deal with the odor of burning marijuana than with the odor of marijuana in its original state. " 'Although there is some controversy as to whether or not the odor of burning marijuana by itself supplies sufficient probable cause for a search or an arrest [cits.], all opinions of this court are in agreement that "it may be con-

sidered and may be a part of a totality of circumstances sufficient to validate one." ' *State v. Medders*, 153 Ga. App. 680, 681 (266 SE2d 331). Accord *Dickson v. State*, 124 Ga. App. 406 (184 SE2d 37); *Rogers v. State*, 131 Ga. App. 136 (3) (205 SE2d 901); *Culpepper v. State*, 132 Ga. App. 733 (1) (209 SE2d 18); *Yawn v. State*, 134 Ga. App. 77 (4) (213 SE2d 178)." *Berry*, supra. Here, the alert of the drug detection dog, the manner of driving of his car by the appellant, the strange odor detected coming from his car, his nervousness, fidgeting and waving his arms and shouting "4 to 1, New York" while being stopped for a traffic offense, and the presence of items usually carried in a trunk of a car which was located in the back seat, are all elements to be considered by the magistrate in determining probable cause to issue a search warrant. Of course, there is the practical perception that considering appellant's erratic driving and his blood alcohol test being zero, if alcohol is not the cause of intoxication, that leaves drugs.

In an appellate determination of whether a magistrate had probable cause to issue a search warrant, the Supreme Court has said that a magistrate's determination of probable cause should be paid great deference. *Illinois v. Gates*, 462 U. S. 213, 236 (103 SC 2317, 76 LE2d 527). And, our appellate standard is a determination of whether the issuing magistrate had a "substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing. . . ." Id. at 236. We conclude that he did have such basis.

*Judgment affirmed. Banke, P. J., and Beasley, J., concur.*

DECIDED NOVEMBER 18, 1988 —
REHEARING DENIED DECEMBER 5, 1988 —

*Minor, Bell & Neal, Rick L. Brown*, for appellant.
*Jack O. Partain III, District Attorney, Steven M. Harrison, Assistant District Attorney*, for appellee.