## A92A1715. THE STATE v. TATE.
(430 SE2d 9)

BEASLEY, Judge.

The question for decision is whether the stop of Tate's car by Deputy Sheriff Shields was lawful under the Fourth Amendment to the United States Constitution.[1] Ruling that it was not, the trial court granted Tate's motion to suppress evidence of cocaine seized by Deputy Shields from within Tate's car. The basis for the court's conclusion that the stop was not lawful was its conclusion that, based on the facts as found, a reasonable officer would not have made the traffic stop in the absence of an ulterior motive to interdict drugs. In other words, the court wrote, the stop was "unreasonably pretextual."[2]

What follows are the facts as found by the trial court. Since they are supported by evidence in the record, we accept them. "[T]he trial court's decision on questions of fact and credibility at a suppression hearing must be accepted unless clearly erroneous. Lego v. Twomey,

---

[1] The state constitutional guarantee against unreasonable searches and seizures, 1983 Ga. Const., Art. I, Sec. I, Par. XIII, was not invoked.

[2] On motion for reconsideration, appellant attached as an exhibit a copy of a letter from the trial judge to counsel for both parties concerning this court's original opinion. It is not part of the record nor are the statements made therein a part of the order under review or a modification or amendment to it. Consequently, it cannot be considered.

404 U. S. 477 (1972); [cits.]." *Woodruff v. State*, 233 Ga. 840, 844 (3) (213 SE2d 689) (1975). "'The [trial] court's findings of fact are viewed under the clearly erroneous standard; . . .'" *United States v. Harris*, 928 F2d 1113 (11th Cir. 1991).

## "FACTS

"At approximately 1:00 a.m. on October 3, 1992, Defendant, O'Dell Tate, was traveling north on Interstate 75 (I-75) in a blue 1979 Oldsmobile Cutlass. As he crossed the line dividing Cobb and Cherokee Counties into Cherokee County he passed the patrol vehicle of Cherokee County Deputy Sheriff Charles Shields. Deputy Shields was in a stationary position off the right side of the interstate observing traffic traveling north.

"Deputy Shields' attention was drawn to Defendant's vehicle because it appeared not to have a tag. He pulled onto the interstate and pulled within 100 feet of the Defendant's vehicle where he was able to observe the vehicle did have a tag but had no tag light. Deputy Shields continued to follow the Defendant and after pulling within 50 feet of his vehicle, observed the vehicle move off into the emergency lane, then drift back across the right lane and the two left tires of Defendant's vehicle barely went over the line between the right lane and the middle lane. By this time, Deputy Shields' patrol car was only 20 to 30 feet behind the Defendant's vehicle. After the Defendant's vehicle again drifted across into the emergency lane, Deputy Shields activated his blue lights and pulled the Defendant over to investigate his erratic driving.

"After both vehicles came to a stop and as Deputy Shields approached the Defendant's car on foot, the Defendant remained in his car with the door open and his legs outside the vehicle. At Deputy Shields direction, the Defendant exited his vehicle and walked to the rear of his vehicle and in front of the patrol car. As requested, the Defendant then presented his driver's license and proof of insurance.

"Deputy Shields then advised the Defendant that he had pulled him over for weaving and for not having a tag light. When the Defendant responded that he was very tired, Deputy Shields inquired about where he was coming from. Defendant responded that he had been to a night club in Atlanta. At this point, Deputy Shields observed a change in the Defendant's 'body language.' The Defendant appeared nervous and began tugging at his clothes, at one time even exposing himself. Defendant explained that he was scared to death because he had just gotten out of prison for possession of a firearm by a felon. Deputy Shields then inquired what other trouble he had been in. The Defendant said 'Armed Robbery' and some other things.

"After this conversation, Deputy Shields subjected the Defendant to several field sobriety tests which led Deputy Shields to conclude

that the Defendant was not under the influence of alcohol or drugs. The Defendant was then issued a warning ticket for weaving and no tag light.

"Deputy Shields then advised the Defendant that 'we had a problem with people hauling illegal drugs, large amounts of cash and illegal weapons up and down the interstate,' and asked the Defendant if he had any of that 'stuff' with him. The Defendant said no. Deputy Shields then asked the Defendant for consent to search his vehicle. At first the Defendant agreed, but later withdrew his consent after Deputy Shields produced a written consent form.

"Deputy Shields then radioed his supervisor, Lt. Robbie Bishop, who was also patrolling Interstate 75 a short distance away, and requested Lt. Bishop to bring a narcotics dog to sniff the Defendant's car. After overhearing this radio communication, the Defendant became nervous and agitated and said something about delivering 'it.' He also said that he had not been paid and that the drugs were on the floor board of the car.

"Deputy Shields then looked through the window of Defendant's car with a flashlight and observed a white paper sack with a clear ziplock bag sticking out of it on the floorboard of the passenger side. Shields also saw a white residue on the inside of the plastic bag. He removed the bag, examined the contents and found what he believed to be cocaine. Defendant was then placed under arrest and given Miranda warnings. Lt. Bishop arrived on the scene shortly thereafter.

"Interstate 75 runs the entire length of Georgia. Only 2.2 miles of the interstate fall within Cherokee County. These 2.2 miles form the southwestern boundary between Cherokee and Cobb counties.

"Lt. Bishop and Deputy Shields are the only officers assigned to the K-9 division of the Cherokee County Sheriff's Department. The K-9 division was started in 1990 by Lt. Bishop. Its mission is to assist the Department in tracking fugitives and narcotics investigations by using certified tracking and narcotics detection dogs. The primary function however, is narcotics investigation and each officer is assigned a dog that is certified in narcotics detection.

"Lt. Bishop has attended five different accredited schools which certified him as a handler of dogs used in narcotics detection as well as other police work. He trained and certified the dogs now assigned to the officers in the K-9 division. He is the most qualified person in the Cherokee County Sheriff's Department in recognizing drug couriers and interdicting illegal drugs transported in vehicles by using narcotics detection dogs.

"Deputy Shields was trained by Lt. Bishop. He is the second most qualified officer in the Cherokee County Sheriff's Department in recognizing drug couriers and interdicting illegal drugs transported in vehicles by using narcotics detection dogs.

"Lt. Bishop is also the supervisor of the Selective Traffic Enforcement Patrol to which Deputy Shields is also assigned. At the direction of their superiors, Lt. Bishop and Deputy Shields focus their attention on traffic enforcement on the 2.2 miles of I-75 in Cherokee County. They spend 75% of their time patrolling these 2.2 miles between the hours of 7:00 p.m. and 4:00 a.m. and always have drug detection dogs in their vehicles. All other members of the Selective Traffic Enforcement Unit are assigned patrol duties in the remainder of Cherokee County."

To these facts, the trial court applied the test for determining the validity of investigatory stops: "in determining when an investigatory stop is unreasonably pretextual, the proper inquiry . . . is not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." *United States v. Smith*, 799 F2d 704, 709 (11th Cir. 1986). In *Smith*, the trial court had found that no traffic violation had occurred, and the appellate court concluded that there was not even probable cause to believe that a traffic violation had occurred or was occurring. Id. at 709.

In this case the court found that defendant was issued a warning ticket for the offenses of weaving (OCGA § 40-6-40 et seq.) and no tag light (OCGA § 40-2-41) and found that there was evidence of each. It also found that the officer stopped the defendant "to investigate his erratic driving." This was supported by the evidence, for the officer testified that he activated his blue lights to stop defendant because the slowing down and repeated weaving was an indication of possible DUI (OCGA § 40-6-391). The court did not find that the weaving and manner of driving were caused by the presence or actions of the police vehicle. The officer also testified that it was his regular practice to stop cars exhibiting such activity as defendant's to investigate for DUI, and that when he is sitting observing traffic, he is watching for speeders and erratic drivers who "can cause wrecks." The court noted that the officer subjected defendant to several field sobriety tests.

" '[The trial court's] application of the law to [the] facts is subject to de novo review.' " *United States v. Harris*, supra at 1116 (1). Whether the facts support a reasonable suspicion of criminal conduct and whether a reasonable officer would have stopped the vehicle in the absence of an invalid purpose are legal and thus de novo questions. *Harris*, supra at 1116 (2).

As we read the trial court's order, it found that the officer's primary motivation for making the stop was to interdict drugs and it concluded that the stop was therefore unreasonably pretextual. However, as articulated in *Smith*, supra, and reiterated in, e.g., *United States v. Bates*, 840 F2d 858, 860 (4) (11th Cir. 1988), the standard

for pretextual stops is measured by " ' "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," and not on the officer's actual state of mind at the time the challenged action was taken.' " The finding of an improper or even illegitimate motivation does not render the stop an unreasonable one. The validity of the stop depends on what the driver was doing and what that reasonably conveyed to the officer, not on what else the officer thought might be occurring.

Here the facts as found by the trial court were that there were traffic offenses occurring in the officer's presence, i.e., no tag light and weaving. Even assuming, considering the nature of the tag light violation and the degree of the weaving, that a reasonable officer would not have stopped the car for these as such, the weaving and the slowed driving late at night constituted reasonable suspicion that defendant was driving while intoxicated. An investigatory stop "must be justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct." *Smith*, supra at 707. Accord *Evans v. State*, 183 Ga. App. 436, 438 (2) (359 SE2d 174) (1987).

We must conclude that, based on all the facts as found by the trial court, a reasonable officer would have made the stop, for as the federal court said in *Bates*, supra at 860: "the patrol officers of Georgia are charged with enforcing Georgia's traffic laws, and this court can presume no less than that a patrol officer would obey this mandate." As written by Judge Hill in his special concurrence in *United States v. Hardy*, 855 F2d 753, 762 (11th Cir. 1988): "One who violates traffic laws is not, because he appears to be a drug courier, immunized from arrest." Or, as articulated in *Williams v. State*, 187 Ga. App. 409, 411 (1) (370 SE2d 497) (1988): "A rule requiring a law enforcement officer to *forego* making a traffic stop which he would otherwise be authorized to make merely because he suspects that the vehicle might be engaged in the transport of illicit drugs would have little to commend it. . . ."

Contrary to the trial court's conclusion, the traffic stop did not constitute merely a pretext to legitimate an impermissible stop to obtain evidence of additional criminal activity. Accord *Hardy*, supra at 756-757 (1).

Traffic stops which resulted in the arresting officers' uncovering evidence of drug possession or trafficking have been upheld on the ground that the drivers had committed traffic violations within the observation of the law enforcement officers who had stopped them. *Guerrero v. State*, 198 Ga. App. 397 (1) (401 SE2d 749) (1991); *O'Keefe v. State*, 189 Ga. App. 519, 521 (1) (376 SE2d 406) (1988); *Williams v. State*, supra; *Lombardo v. State*, 187 Ga. App. 440, 441 (2) (370 SE2d 503) (1988); *Whisnant v. State*, 185 Ga. App. 51, 52 (1) (363 SE2d 341) (1987); *Lopez v. State*, 184 Ga. App. 31 (1) (360 SE2d

722) (1987); *Steward v. State*, 182 Ga. App. 659, 660 (1) (356 SE2d 890) (1987); *United States v. Harris*, supra at 1116 (2); *United States v. Hardy*, supra at 756 (1); *United States v. Bates*, supra.

In contrast, traffic stops have been held to be unlawful where the defendants committed no traffic violations, and the stops, though based on drug courier profiles, were not justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct. *Brown v. State*, 188 Ga. App. 184 (372 SE2d 514) (1988); *Tarwid v. State*, 184 Ga. App. 853 (1) (363 SE2d 63) (1987); *United States v. Miller*, 821 F2d 546, 549 (2) (11th Cir. 1987); *United States v. Smith*, supra.

The facts in this case distinguish it from *Tarwid* where defendants were stopped sometime after midnight because they were driving 45 to 50 mph and traffic was generally moving at 60 to 65 mph; *Brown*, where defendant's vehicle made a quick lane change to get out of the way of the law enforcement vehicle which had its blue lights activated; *Miller*, where defendant allowed his right wheels to cross over the lane marker about four inches and drove in that manner for approximately six-and-one-half seconds; and *Smith*, where the officer observed the right side of the defendant's car weave approximately six inches into the emergency lane and then slightly within the lane in which it was traveling, which was attributed to the driver taking his eyes off the road and looking at the flashing lights of the patrol car as he was being stopped. This case is more akin to *Guerrero*, where defendant was stopped after an officer observed him weaving three times on an interstate highway.

We make no judgment about the validity of the officer's actions after the warning ticket was issued, as that subsequent part of the encounter was not challenged, ruled on, or raised on appeal.

*Judgment reversed. Birdsong, P. J., and Andrews, J., concur.*

DECIDED JANUARY 4, 1993 —
RECONSIDERATION DENIED MARCH 24, 1993 —

*Garry T. Moss, District Attorney, Gregory A. Hicks, Assistant District Attorney*, for appellant.
*John R. Hesmer, Jane P. Manning*, for appellee.