213 P.3d 230

**The STATE of Arizona, Appellee,**

v.

**Jose Salvador GUILLEN, Appellant.**

**No. 2 CA–CR 2007–0365.**

Court of Appeals of Arizona, Division 2, Department B.

June 24, 2009.

Terry Goddard, Arizona Attorney General By Kent E. Cattani and Kathryn A. Damstra, Tucson, Attorneys for Appellee.

Emily Danies, Tucson, Attorney for Appellant.

## OPINION

ECKERSTROM, Presiding Judge.

¶ 1 Following a jury trial, appellant Jose Guillen was convicted of possession of more than four pounds of marijuana for sale, a class two felony, and possession of drug paraphernalia, a class six felony. The trial court sentenced him to concurrent, mitigated and presumptive prison terms, the longer of which is four years. Before trial, Guillen filed a motion to suppress physical evidence and statements he made to police, which the court denied following an evidentiary hearing. Guillen now challenges that ruling on appeal.

¶ 2 When reviewing a trial court's denial of a motion to suppress, we review only the evidence presented at the suppression hearing, *State v. Blackmore*, 186 Ariz. 630, 631, 925 P.2d 1347, 1348 (1996), and view it in the light most favorable to upholding the trial court's factual findings. *State v. Gerlaugh*, 134 Ariz. 164, 167, 654 P.2d 800, 803 (1982). We review the court's decision "for abuse of discretion if it involves a discretionary issue, but review constitutional issues and purely legal issues de novo." *State v. Booker*, 212 Ariz. 502, ¶ 10, 135 P.3d 57, 59 (App.2006).

¶ 3 In March 2006, officers received information that Guillen had been storing marijuana in large freezers in the garage at his residence. Approximately eight months later, Arizona Department of Public Safety Officer Ballesteros and Oro Valley Police Officer Soto conducted surveillance of Guillen's residence. Specifically, the officers followed Guillen's wife as she left the residence and asked Marana Police Officer Moreno, a canine handler and narcotics investigator, to conduct a canine investigation at the house in her absence. Moreno confirmed with Ballesteros that he would walk with the narcotics-detection dog to the garage on Guillen's property and then report his observations to Ballesteros.

¶ 4 The attached, enclosed garage and front door to the residence were both accessible by traversing Guillen's driveway. Guillen had erected no fences or barriers obstructing access to the property. And he had posted no signs expressly prohibiting public entry. Moreno and the dog walked onto Guillen's property and "check[ed]" the areas around Guillen's front and garage doors. At the garage, Moreno focused the dog on the areas underneath, and at the sides of, the door—presumably to expose the dog to any scents emanating from inside the garage. The dog began barking and scratching, indicating it had detected the odor of a "narcotic or dangerous drug."

¶ 5 Armed with this information, Soto approached Guillen's wife in the driveway when she returned home. Soto identified himself as a police officer and asked if he could speak with her. She agreed and permitted Soto

and Ballesteros to come inside the house to talk. Once inside, the officers told Guillen's wife they had information that the residence was being used as a possible "stash house" and asked for permission to search the premises; she consented. After she led them through the house into the garage, both officers detected a "strong odor of marijuana." Guillen's wife agreed to open the garage door to the driveway, and Moreno then brought the dog inside. The dog immediately ran to one of three large freezers covered with brown tarpaulins and alerted on it by "jumping up on the freezer[,] barking and scratching."

¶ 6 Guillen's wife allowed the officers to open an unlocked freezer. The freezer was empty but smelled as if marijuana "had been there at one time." Ballesteros then secured a telephonic search warrant. In the ensuing search, the officers discovered bales of marijuana packed inside the two freezers that had been locked. They also found "packaging items" and a plastic table elsewhere in the garage.

## CANINE SNIFF SEARCH UNDER FOURTH AMENDMENT

¶ 7 Guillen first argues that the warrantless dog sniff, conducted on his property at the front of the garage, was an illegal search of his home in violation of the Fourth Amendment to the United States Constitution. Although acknowledging that officers may generally traverse areas around a home "that are impliedly open to the public," Guillen contends the sniff search here reached inside his home "to explore details ... which would not be revealed without physical intrusion."

¶ 8 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Searches conducted inside a home without a search warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). "To claim protection under the Fourth Amendment, a defendant must have a legitimate expectation of privacy in the invaded place." *State v.*

*Millan*, 185 Ariz. 398, 401, 916 P.2d 1114, 1117 (App.1995). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

¶ 9 Neither the United States Supreme Court nor any Arizona state court has specifically addressed the circumstances under which an officer may direct a narcotics-detection dog to sniff along the seams of a residential structure. However, the Supreme Court has considered the constitutionality of canine sniffs in other contexts. In *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), it held that exposing a defendant's luggage, located in a public place, to a sniff by a narcotics dog "did not constitute a 'search' within the meaning of the Fourth Amendment." There, the Court reasoned:

A "canine sniff" by a well-trained narcotics detection dog ... does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view.... Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item....

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.

*Id.* More recently, the Court has reaffirmed this analytical framework, observing that "governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest' " and holding, for that reason, that a canine sniff performed on the exterior of a lawfully detained car "does not rise to the level of a constitutionally cognizable infringement." *Illinois v. Caballes*, 543 U.S. 405, 408–09, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (emphasis in original), *quoting Jacobsen*, 466 U.S. at 123, 104 S.Ct. 1652.

¶ 10 In short, the Court has consistently characterized the canine sniff as a unique, minimally invasive species of search that, at least when applied to sniffs of lawfully detained vehicles and luggage in public places, is not a constitutionally relevant intrusion. In this case, we must determine whether the same is true when that unique species of search occurs at the threshold of, and collects information from inside, a private residence.

¶ 11 The Court has identified the right to be free from unreasonable searches and seizures in the home as " 'the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), *quoting United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). And, it has observed:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their … houses … shall not be violated." … [Therefore,] the Fourth Amendment has drawn a firm line at the entrance to the house.

*Payton*, 445 U.S. at 589–90, 100 S.Ct. 1371 (citation omitted).

¶ 12 In conformity with those principles, the Court has found the government's probe of a home with thermal-imaging equipment, deployed from a public thoroughfare, to be an unconstitutional search requiring a warrant. *Kyllo v. United States*, 533 U.S. 27, 28, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Guillen contends the canine sniff performed here is analogous to the thermal-imaging search conducted in *Kyllo* and argues the sniff must likewise be unlawful in the absence of a warrant.

¶ 13 We agree that the government's use of thermal-imaging equipment in *Kyllo* and the state's use of a canine sniff in this case share certain relevant characteristics. In both instances, the officers essentially deployed "sense-enhancing" tools to collect information from inside a home without having to physically enter the structure. *Id.* at 34, 121 S.Ct. 2038 (majority describing thermal-imaging device as "sense-enhancing technology" providing "information regarding the interior of the home"). Most saliently, both searches conveyed only limited information about the interior of the residences: the record here suggests the dog was trained to alert exclusively to the odor of narcotics, and the thermal-imaging equipment in *Kyllo* could only show "heat images" in black and white. *See id.* at 40, 121 S.Ct. 2038 (majority acknowledging possible conclusion from thermal images that "no 'significant' compromise of the homeowner's privacy has occurred").

¶ 14 But the two search methods are distinguishable in one crucial respect: the canine sniff yielded information exclusively about the presence or absence of contraband, while the thermal-imaging equipment could potentially reveal private information from the inside of the defendant's home that was unrelated to any illegal activity. Indeed, the Court recently distinguished canine sniff searches from thermal-imaging scans on this very ground:

> The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection [by a canine sniff] of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

*Caballes*, 543 U.S. at 410, 125 S.Ct. 834. Thus, both canine sniffs of a vehicle or other containers and thermal-imaging searches of a residence may be comparatively minor intrusions when compared with an officer's physical search of either. But the Court has characterized dog sniffs of containers as qualitatively different events because, in its view, they implicate no reasonable privacy interest at all. *Id.* at 408, 125 S.Ct. 834 ("We have held that any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the

possession of contraband *'compromises no legitimate privacy interest.'"*) (second emphasis added), *quoting Jacobsen,* 466 U.S. at 123, 104 S.Ct. 1652.

¶ 15 At the same time, the Court has not tolerated even minor intrusions into the privacy of the home and has made clear that any such intrusion, however slight, presumptively requires a warrant. Indeed, when analyzing reasonable expectations of privacy under the traditional criteria set forth in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court has suggested it will recognize *all* subjective expectations of privacy as reasonable when the interior of a home is involved. *See Kyllo,* 533 U.S. at 33–34, 121 S.Ct. 2038 (restating *Katz* rule that Fourth Amendment search occurs only when "government violates a subjective expectation of privacy that society recognizes as reasonable" and suggesting all privacy expectations in home are categorically so viewed). Specifically, it has observed:

> The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained.... In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes.

*Id.* at 37–38, 121 S.Ct. 2038.

¶ 16 Our jurisprudence suggests that the home enjoys such special protection because persons have privacy expectations, unique to their homes, not implicated in comparable searches of containers such as luggage or car trunks. Generally, the privacy interests recognized in closed luggage or car trunks relate exclusively to personal possessions and effects lawfully possessed—interests not offended by a dog sniff that will expose only the presence of contraband. *See Caballes,* 543 U.S. at 408–09, 125 S.Ct. 834. In contrast, reasonable expectations of privacy in one's place of residence encompass additional interests in personal security, tranquility, and repose. Over eighty years ago, Justice

Brandeis famously observed in the context of a governmental intrusion into the home that the constitutional protection of privacy "confer[s], as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled by Katz.*[1] As the Court's reasoning in *Kyllo* suggests, such interests can be offended by any governmental probe of the home, regardless of what that search may or may not expose.

¶ 17 In sum, the Court has held both (1) that dog sniffs, in several contexts, do not implicate reasonable expectations of privacy because they reveal only contraband, *Caballes,* 543 U.S. at 410, 125 S.Ct. 834, and (2) *any* intrusion into a home categorically implicates a reasonable expectation of privacy, regardless of the nature of the information sought or collected. *Kyllo,* 533 U.S. at 37, 121 S.Ct. 2038. We must therefore determine which of these two categorical principles controls here, a vexingly close question. We note, however, that the Court issued its ruling in *Caballes* after its ruling in *Kyllo,* and, although *Caballes* refers to *Kyllo,* the Court did not expressly limit its reasoning in *Caballes* to canine searches unrelated to the home. Because the Court has addressed such searches exclusively in the context of containers, we are mindful that there are aspects of home privacy implicated by canine sniff searches that the Court has not yet contemplated. Nonetheless, we join the majority of jurisdictions in concluding that, given the apparent direction of that jurisprudence, a dog sniff reaching into a home does not rise to the level of a "cognizable infringement" under the Fourth Amendment to the United States Constitution. *Caballes,* 543 U.S. at 409, 125 S.Ct. 834; *see United States v. Reed,* 141 F.3d 644, 650 (6th Cir.1998) (canine sniff not Fourth Amendment search as long as canine unit lawfully present at location where sniff occurs); *United States v. Roby,* 122 F.3d 1120, 1124–25 (8th Cir.1997)

---

1. This portion of Brandeis's dissent has since been repeatedly quoted with approval in majority opinions issued by the Court. *E.g., Winston v. Lee,* 470 U.S. 753, 758, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); *Calif. Bankers Ass'n v. Shultz,* 416 U.S. 21, 65, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974).

(trained dog's detection of odor in common corridor of hotel does not violate Fourth Amendment); *United States v. Colyer*, 878 F.2d 469, 475–77 (D.C.Cir.1989) (canine sniff not Fourth Amendment search when conducted on train sleeping compartment from public corridor); *Fitzgerald v. State*, 153 Md. App. 601, 837 A.2d 989, 1035 (2003) ("[A] sniff by a trained dog, standing where it has a right to be, of odors emanating from any protected place, residence or otherwise, is not a 'search' within the contemplation of the Fourth Amendment."); *People v. Dunn*, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1056 (1990) (canine sniff outside apartment not Fourth Amendment search); *see also United States v. Lingenfelter*, 997 F.2d 632, 638–39 (9th Cir.1993) (in context of commercial warehouse search, rejecting reasoning of another circuit court that dog sniff violated legitimate expectation of privacy in dwelling). *But see United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.1985) (heightened expectation of privacy in home rendered warrantless canine sniff unconstitutional search); *Florida v. Rabb*, 920 So.2d 1175, 1188 (Fla. Dist.Ct.App.2006) (use of canine sniff to detect contraband inside home Fourth Amendment search); *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805, 817 (1999) (absent reasonable suspicion, Fourth Amendment violated by canine sniff at apartment threshold).

**2.** In the introductory paragraph of his motion to suppress, Guillen moved generally to suppress the "physical evidence" secured from his home on grounds that the evidence was acquired in violation of his rights under both the Fourth Amendment to the United States Constitution and article II, § 8 of the Arizona Constitution. Later, he again asserted his entitlement to relief under article II, § 8 in the text of his supporting argument. We think that two such mentions of a specific Arizona constitutional provision, within a motion to suppress covering only six pages of total text, in a context wherein the federal citations therein provided were equally germane to the state constitutional question, was sufficient to alert the trial court that Guillen was asserting his motion to suppress under the Arizona Constitution as well as the Fourth Amendment. However, we agree with our dissenting colleague that the more limited reference to the Arizona Constitution in Guillen's appellate opening brief was not sufficient to trigger our duty to review that claim and, under most circumstances, we would decline to address it. But, such deficiencies in an appellate brief do not deprive this court of jurisdiction and we may exercise our discretion

## CANINE SNIFF SEARCH UNDER ARTICLE II, § 8

■ ¶ 18 We next address whether the warrantless canine sniff of the seams of Guillen's home violated article II, § 8 of the Arizona Constitution.[2] That section provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Although Arizona's state constitutional provisions generally were intended to parallel federal constitutional protections, *Malmin v. State*, 30 Ariz. 258, 261, 246 P. 548, 549 (1926), Arizona's highest court has observed that article II, § 8 is worded differently than the Fourth Amendment and is more specific than its federal counterpart in "preserving the sanctity of homes and in creating a right of privacy." *State v. Bolt*, 142 Ariz. 260, 264–65, 689 P.2d 519, 523–24 (1984).

¶ 19 For this reason, the Arizona Supreme Court has not hesitated to forge its own path in articulating the scope of Arizona's right to privacy in the home. *See id.* at 264–65, 689 P.2d at 523–24 (deciding propriety of warrantless home entry on state constitutional grounds rather than Fourth Amendment grounds, recognizing "possibility that our interpretation of the Arizona search and seizure constitutional provision more narrowly

to address inadequately raised claims when they broach a matter of statewide importance. *See Larsen v. Nissan Motor Corp.*, 194 Ariz. 142, ¶ 12, 978 P.2d 119, 124 (App.1999) (addressing state constitutional claim not properly preserved on grounds of statewide importance). Were we to bypass the state constitutional aspect of the canine sniff search here, when such analysis leads to a different result than our analysis under the Fourth Amendment, we would risk misdirecting our law enforcement agencies. And, we think those agencies would be justifiably frustrated at our use of such a piecemeal approach—after they have adjusted their practices, and developed their prosecutions, in reliance on an incomplete analysis. Notably, this court ordered oral argument and, in conformity with our court's longstanding practice, distributed a draft decision alerting the parties to this court's inclination to address the state constitutional question. By this method, the parties were provided over one week to develop and present oral arguments on that issue. Indeed, the state filed two supplemental pleadings in advance of oral argument addressing the state constitutional aspect of the claim.

circumscribes the right of police to make a warrantless entry [into the home]"); *see also State v. Ault,* 150 Ariz. 459, 466, 724 P.2d 545, 552 (1986) ("Our decision not to extend the inevitable discovery doctrine into defendant's home in this case is based on ... art. [II], § 8 of the Arizona Constitution regardless of the position the United States Supreme Court would take on the issue."). As the Arizona Supreme Court long ago observed:

> It is true that we have held ... that section 8 of article [II] of the Constitution of Arizona is of the same general effect and purpose as the Fourth Amendment to the Constitution of the United States. We have the right, however, to give such construction to our own constitutional provisions as we think logical and proper, notwithstanding their analogy to the Federal Constitution and the federal decisions based on that Constitution.

*Turley v. State,* 48 Ariz. 61, 70–71, 59 P.2d 312, 316–17 (1936). Applying these principles here, we hold that canine sniff searches of a residence, conducted from the threshold of a home, interfere with reasonable expectations of privacy and violate article II, § 8 of the Arizona Constitution to the extent they are conducted in the absence of reasonable suspicion to believe contraband may be found.

¶ 20 In so concluding, we have no quarrel with the United States Supreme Court's general observations that canine sniff searches are considerably less intrusive than physical searches of containers and vehicles. *See Caballes,* 543 U.S. at 409, 125 S.Ct. 834; *Place,* 462 U.S. at 707, 103 S.Ct. 2637. And we agree with the view that a sniff search reaching into a home would likewise be comparatively less intrusive than an officer's physical entry into the premises. But, when the target of a search is a person's residence, we cannot agree that a canine sniff implicates no expectation of privacy at all beyond a criminal's illegitimate privacy interest in his or

her contraband. *See Caballes,* 543 U.S. at 408–09, 125 S.Ct. 834.

¶ 21 In contrast to a person's privacy interest in luggage or the trunk of a car—spaces people use but do not themselves occupy—courts have long recognized as reasonable the expectation that a person's home will be protected from governmental probing of any kind absent lawful authority. *See Kyllo,* 533 U.S. at 34, 121 S.Ct. 2038. As shall be discussed below, potential interference with legitimate privacy interests in the home can occur not only in the scrutiny of personal effects but also in the disruption of a person's right to a sense of security and repose therein.

¶ 22 When describing the scope of that right as guaranteed by article II, § 8 of the Arizona Constitution, the Arizona Supreme Court has observed: "Our constitutional provisions were intended to give our citizens *a sense of security* in their homes...." *Bolt,* 142 Ariz. at 265, 689 P.2d at 524 (emphasis added). The United States Supreme Court has similarly acknowledged that traditional notions of home privacy include an interest in simple repose: "In 1604, an English court made the now-famous observation that 'the house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose.'" *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), *quoting Semayne's Case,* 77 Eng. Rep. 194, 5 Co. Rep. 91a, 91b, 195 (K.B.);[3] *The American Heritage Dictionary* 1049 (2d college ed. 1982) (defining "repose" as "[c]almness; tranquility").

¶ 23 As discussed, the Court has articulated this privacy interest as " 'the right to be let alone' " and has characterized it as " 'the most comprehensive of rights and the right most valued by civilized man.' " *Winston v. Lee,* 470 U.S. 753, 758, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), *quoting Olmstead,* 277 U.S. at 478, 48 S.Ct. 564 (Brandeis, J., dissenting), *overruled by Katz.*[4] And the Su-

---

3. Contrary to our dissenting colleague's suggestion, we do not here rely on the underlying holding of a 1604 English case. Rather, we rely on a contemporary United States Supreme Court opinion that chose to emphasize certain language from a 1604 case.

4. Our colleague complains that we rely on the dissent from an "eighty-year-old federal case" when we acknowledge the reasoning of Justice Brandeis in *Olmstead.* But, as observed previously, and made clear by our citation here, that particular reasoning has been quoted and

preme Court has, in various ways since that time, acknowledged this privacy dimension when assessing purported governmental intrusions into the home. In *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), the majority of the Court emphasized that, under the Fourth Amendment, the home should be an " 'oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.' " *Id.* at 511–12, 81 S.Ct. 679, quoting *United States v. On Lee*, 193 F.2d 306, 315–16 (2d Cir.1951) (Frank, J., dissenting). Indeed, the Court's opinion in *Kyllo* also implicitly embraced such a notion of privacy in holding that all expectations of privacy in the interior of a home are recognized as reasonable. 533 U.S. at 34, 121 S.Ct. 2038.[5]

¶ 24 By those standards, we have little difficulty concluding that a canine sniff that occurs at the threshold of a home, and collects information from inside, intrudes upon an expectation of privacy that our society has long recognized as reasonable. We believe a law-abiding person could reasonably perceive the specter of a uniformed police officer deploying a trained narcotics dog along the seams of his or her home as an unsettling and embarrassing event. *See Caballes*, 543 U.S. at 421–22, 125 S.Ct. 834 (Ginsberg, J., dissenting) (characterizing canine dog sniff during routine traffic stop as intimidating event changing "character of the encounter," making it "broader, [and] more adversarial," and likely causing "distress and embarrassment" to law-abiding persons); *see also Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74, 79–80 (1987) (suggesting canine sniff search can entail "harassment, annoyance, inconvenience and humiliation"). Even persons with nothing to hide may worry about why their homes have been targeted in the first instance and ,whether the search could reveal something of which they were unaware. Nor would such anxiety during a canine search be entirely unwarranted. As the dissent in *Caballes* observed, the "infallible dog ... is a creature of legal fiction." 543 U.S. at 411–12, 125 S.Ct. 834 (Souter, J., dissenting) (collecting cases showing significant error rates and study demonstrating even "generally reliable" dogs return false positives "12.5% to 60% of the time"). Thus, even for the person whose residence contains no contraband, a canine sniff carries a worrisome possibility that officers may later appear with a search warrant, based on an erroneous, false-positive response.

¶ 25 The dissent correctly observes that officers may lawfully, without reasonable suspicion, approach a home's front door to conduct a consensual inquiry of a resident. *See Baker v. Clover*, 177 Ariz. 37, 39, 864 P.2d 1069, 1071 (App.1993) (recognizing, in Fourth Amendment context, reasonable expectation that members of society, including police officers on police business, may use driveway, walkway, and normal access route to reach residence). But, there is a marked difference between such a benign approach—which the resident may lawfully ignore altogether by declining to acknowledge the officer or declining to answer any inquiry—and the arrival on one's threshold of an officer in the act of deploying a sensory-enhancing piece of equipment, without the consent of the resident, designed to collect information from within the residence. Indeed, when an officer deploys a dog to sniff the seams of a house, the officer has unmistakably targeted the residents of the home for criminal investigation. We do not believe that an officer's mere arrival on a threshold, without a canine, to make an inquiry on some unknown topic is similarly embarrassing or worrisome for a law-abiding citizen.

¶ 26 Accordingly, although canine sniff searches may be less intrusive than physical

---

adopted by the majority opinions in several subsequent United States Supreme Court cases. It is therefore part of the fabric of our nation's jurisprudence describing expectations of home privacy.

5. In further emphasizing that reasonable privacy rights at home do not depend on the nature of the information sought or acquired by the governmental action, the majority reminded the dissent of its caution in *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), that, when a plumber is present, a " 'bathtub is a less private area ... even if his back is turned.' " *Kyllo*, 533 U.S. at 39, 121 S.Ct. 2038, *quoting Karo*, 468 U.S. at 735, 104 S.Ct. 3296 (Stevens, J., concurring in part and dissenting in part).

searches by law enforcement authorities, they can also be intimidating, embarrassing, distressing, and worrisome encounters disrupting a person's privacy interest in being "let alone" at home.[6] *Olmstead*, 277 U.S. at 478, 48 S.Ct. 564 (Brandeis, J., dissenting). We read article II, § 8 of the Arizona Constitution as entitling Arizona residents to a "sense of security" in their homes, free of such probes in the absence of reasonable cause to believe contraband will be found. *Bolt*, 142 Ariz. at 265, 689 P.2d at 524. The emphasis on "the right of privacy" and "the sanctity of homes" evident in article II, § 8 reinforces our understanding of its text. *Id.* at 264–65, 689 P.2d at 523–24 (article II, § 8 "specific in preserving the sanctity of homes and in creating a right of privacy").[7]

¶ 27 Nor are we alone in reaching that conclusion. As observed, the majority of federal circuits and state courts addressing whether sniff searches of the seams of a home violate the Fourth Amendment have concluded, or suggested, they do not. *See* ¶ 17 *supra*. But, of those states that, like Arizona, construe their respective state constitutions as providing, at least in some contexts, more protection from searches and seizures than that conferred by the Fourth Amendment, most have found such searches to be cognizable intrusions requiring some reasonable justification. *See Dunn*, 563 N.Y.S.2d 388, 564 N.E.2d at 1057–58 (holding dog sniff at threshold of apartment requires reasonable suspicion); *State v. Dearman*, 92 Wash.App. 630, 962 P.2d 850, 852, 853 n. 5, 854 (1998) (finding warrant required to conduct dog sniff at threshold of home under state constitutional provision with wording identical to article II, § 8 of Arizona Constitution); *see also Pooley v. State*, 705 P.2d 1293, 1310–11 (Alaska App.1985) (holding dog sniff is search requiring reasonable suspicion under state constitution); *People v. Boylan*, 854 P.2d 807, 810–11 (Colo.1993) (reasonable suspicion required under state constitution to conduct sniff search generally); *State v. Wiegand*, 645 N.W.2d 125, 132, 135 (Minn.2002) (same); *Johnston*, 530 A.2d at 79–80 (state constitution requires reasonable suspicion for canine sniff searches generally); *State v. Pellicci*, 133 N.H. 523, 580 A.2d 710, 715, 716 (1990) (under state constitution canine sniff search of car required reasonable suspicion of contraband). *But see Fitzgerald v. State*, 153 Md.App. 601, 837 A.2d 989, 1035 (2003) (suggesting Maryland Constitution requires no different result than Fourth Amendment).[8] And, some of those courts have expressed a concern that any other conclusion would sanction indiscriminate canine sweeps of residential thresholds—a prospect those courts have characterized as " 'Orwellian' " and " 'repugnant' " to constitutionally protected expectations of privacy in the home. *Ortiz*, 600 N.W.2d at 816, *quoting Dunn*, 563 N.Y.S.2d 388, 564 N.E.2d at 1058.[9]

6. Of course, a resident need not be physically present when the sniff search is conducted to be later worried, unsettled, distressed, or embarrassed by the fact that it occurred.

7. The dissent correctly observes that our dispositive reasoning here is not found either in Guillen's initial motion to suppress or his opening brief on appeal. But once we address a claim, we have a duty to resolve it correctly and explain our reasoning in doing so. Thus, although our review is generally limited to the claims and record properly before us, neither court rule, legal precedent, nor logic limits us to the reasoning or legal authority presented by either party when we resolve claims. *See Decola .v. Freyer*, 198 Ariz. 28, ¶ 8, 6 P.3d 333, 336 (App.2000).

8. As discussed above, in the limited context of home searches, our state supreme court has held expressly that the text of our state constitution places greater emphasis on home privacy rights than does its federal equivalent. *Ault*, 150 Ariz. at 463, 724 P.2d at 549; *Bolt*, 142 Ariz. at 264–65, 689 P.2d at 523–24. For that reason, we must analyze home searches under our state constitution through different lenses than those states that hew exclusively to federal constitutional law in analyzing such issues. Our review of non-Arizona authority therefore focuses on those jurisdictions, like our own, that similarly assess search and seizure questions independently under their respective state constitutions. Thus, although we find the extra-jurisdictional precedent cited in the dissenting opinion certainly relevant to the Fourth Amendment question, we find those cases somewhat less instructive on the state constitutional issue before us.

9. Our dissenting colleague observes that such an indiscriminate approach is not before the court today. But, were we to rule, as the dissent asserts we must, that dog sniffs conducted at the threshold of a private residence are not searches at all and constitute no cognizable governmental intrusion on any privacy interest, such sweeps

¶ 28 The dissent asserts our conclusion defies settled Arizona law, contending our supreme court's holding in *State v. Morrow*, 128 Ariz. 309, 625 P.2d 898 (1981), should control our result here. But that case addressed only the propriety of a dog sniff of luggage under the Fourth Amendment. It did not purport to address either the propriety of such a search when deployed at the threshold of a person's home or whether the language of article II, § 8 of the Arizona Constitution might compel a different result under such circumstances.

¶ 29 And, *Morrow's* core holding, that the government conducts no search when it merely collects emanations escaping from a protected area into the public domain, 128 Ariz. at 312–13, 625 P.2d at 901–02, has since been overtaken and limited by subsequent decisions of the United States Supreme Court. In *Kyllo*, the government similarly contended that its use of thermal-imaging equipment, deployed from a public thoroughfare, to collect heat that had fully escaped from a suspect's home into the public domain, violated no privacy interest. 533 U.S. at 35, 121 S.Ct. 2038. The Court disagreed and held that the government's collection "by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' constitutes a search—at least where (as here) the technology in question is not in general public use." *Id.* at 34, 121 S.Ct. 2038, *quoting Silverman*, 365 U.S. at 512, 81 S.Ct. 679. Thus, the Court has made clear that neither the ability of sensory-enhancing equipment to collect information from emanations that have escaped into a public area, nor an officer's deployment of that equipment from a lawful location, immunizes such a probe of a home from constitutional scrutiny. *See id.* at 34–35, 121 S.Ct. 2038. In contending otherwise based on *Morrow*, our dissenting colleague overlooks more current, controlling precedent.[10]

¶ 30 Thus, we hold that a dog sniff of the seams of a residence constitutes a cognizable intrusion under article II, § 8 of the Arizona Constitution. However, we do not conclude that such a search required the officers to have obtained a warrant upon a showing of probable cause. Although article II, § 8 is more explicit than the Fourth Amendment in characterizing the home as a zone of privacy, it contains no language comparable to that of its federal counterpart requiring a warrant for all searches in the home. Thus, nothing in the text of the Arizona Constitution necessarily mandates a search warrant for the limited intrusion involved in this case. In our view, the disruption of a person's sense of security and repose caused by a canine sniff search of a home is far more analogous to that occasioned by a brief, investigatory detention—a governmental act requiring reasonable suspicion—than to the intrusion caused by a physical entry into a residence, which requires a warrant issued on probable cause. *See Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (recognizing brief investigatory detention involves lesser intrusion than search of home and holding only reasonable suspicion required to conduct it). And, the bulk of states addressing the issue under their state constitutions have reached the same conclusion. *See* ¶ 27 *supra*. We likewise conclude that law enforcement officers need only a reasonable suspicion that contraband may be found in a home in order to conduct a canine sniff search of the exterior of the home.[11] Accordingly, we remand this

---

would become unquestionably lawful in Arizona. We know of no basis for the dissent's prediction about whether law enforcement agencies would or would not employ such investigative techniques if legally authorized to do so.

**10.** Nor does the Court's opinion in *Caballes*, subsequent to *Kyllo*, alter this conclusion. In *Caballes*, the Court held permissible a canine sniff of a car trunk because the defendant had no reasonable expectation of privacy in contraband. 543 U.S. at 408–09, 125 S.Ct. 834. Contrary to the dissent's suggestion, *Caballes* did not hold that the sniff was permissible because the aromas in question had escaped into the public domain.

**11.** Although the law is well settled that police officers have the same right of access as any member of the general public to the curtilage of a person's property, *see Baker v. Clover*, 177 Ariz. 37, 39, 864 P.2d 1069, 1071 (App.1993) (recognizing, in Fourth Amendment context, reasonable expectation that members of society, including police officers on police business, may use driveway, walkway, and normal access route to reach residence), some authority suggests an offi-

case to the trial court to determine whether the officers here had reasonable suspicion to believe contraband would be found inside the Guillen home before the sniff search was performed.

¶ 31 Assuming, *arguendo*, the trial court concludes the canine sniff violated the Arizona Constitution, it must then consider whether the marijuana later found, during the continued investigation of the Guillen residence, should be suppressed as fruit of the poisonous tree. *See State v. Fornof,* 218 Ariz. 74, ¶ 5, 179 P.3d 954, 956 (App.2008) (requiring suppression of evidence obtained from police encounter not based on reasonable suspicion); *accord State v. Richcreek,* 187 Ariz. 501, 506, 930 P.2d 1304, 1309 (1997). The state emphasizes, and the trial court found, that the contraband was discovered pursuant to a consent search of the residence and that the officers used no information gained from the dog sniff to secure that consent. But the record also suggests the officers might not have attempted to approach Guillen's wife and seek such consent if the narcotics dog had not first confirmed the apparent presence of marijuana on the premises.[12] *See Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 391–92, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (setting forth basic fruit-of-poisonous-tree doctrine: government may not use knowledge gained by its own wrongdoing to obtain evidence against accused); *see also Walder v. United States,* 347 U.S. 62, 64–65, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (government may not "support a con-

viction on evidence obtained through leads from . . . unlawfully obtained evidence").

¶ 32 Thus, if the trial court concludes the canine sniff was conducted in violation of the Arizona Constitution, it must then determine whether the officers used the information acquired to trigger the next step in their investigation—asking for consent to search the house—or whether, in the alternative, they would have taken that step regardless of the outcome of the dog sniff. *See Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (setting forth independent-source doctrine allowing admission of evidence obtained by "later, lawful seizure [that] is genuinely independent of an earlier, tainted one"); *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (applying inevitable-discovery doctrine to allow admission of illegally obtained evidence that "ultimately or inevitably would have been discovered by lawful means"); *Bolt,* 142 Ariz. at 269, 689 P.2d at 528 (exclusionary rule no broader under Arizona Constitution).

¶ 33 We reverse the trial court's denial of Guillen's motion to suppress both the marijuana found in his garage and his statements to law enforcement officers, and we remand the case for further proceedings consistent with this decision.

CONCURRING: GARYE L. VÁSQUEZ, Judge.

cer entering to deploy a narcotics-detection dog would exceed the scope of that right of access. *See Ortiz,* 600 N.W.2d at 819–20 (holding officer with drug-detection canine exceeded scope of resident's expectation of privacy in hallway of apartment building); *State v. Ross,* 91 Wash.App. 814, 959 P.2d 1188, 1190 (1998) (finding officers not lawfully within curtilage after exceeding scope of implied invitation to be there). Thus, although police officers are entitled to the same access to curtilage that a resident allows delivery people or the general public, *see Baker,* 177 Ariz. at 39, 864 P.2d at 1071, we question whether any category of visitor could claim the same implicit consent to such access, consistent with a resident's reasonable expectations of privacy, when the visitor is armed with equipment designed to probe the private portions of the residence. However, because Guillen did not argue the officer exceeded the scope of his implied invitation

to be on the curtilage of Guillen's property by bringing the drug-detection dog, and because we have granted Guillen relief on other grounds, we decline to address that question here.

12. The officers had received a tip more than eight months earlier that the Guillen residence was being used to store marijuana. Nonetheless, they had refrained during that entire period from simply walking to the door and seeking consent to search. Even when they began further investigation of the house, the officers did not approach the occupants to seek consent to search but, rather, waited until the house appeared unoccupied to deploy the narcotics dog. In short, the record suggests the officers did not wish to alert the residents to the investigation until the officers felt confident the contraband necessary to prove their case would be found inside.

ESPINOSA, Judge, dissenting.

¶ 34 I respectfully disagree, on a number of grounds, with the majority's conclusion that the dog sniff at issue here may have violated the Arizona Constitution and is subject to a new standard of reasonable suspicion.[13] First and foremost, this court should not be reaching out to decide a case on a basis that was never argued below. No mention of a new and unprecedented right of "tranquility and repose" barring a dog sniff outside one's home was ever made nor was such a concept suggested during either the suppression hearing or the bench trial below. It is well established that we will not reverse a trial court on an issue and argument it never had an opportunity to consider or address. See State v. Hamblin, 217 Ariz. 481, n. 2, 176 P.3d 49, 51 n. 2 (App.2008) (argument made for first time on appeal forfeited absent fundamental error); State v. Rojers, 216 Ariz. 555, ¶ 13, 169 P.3d 651, 654 (App. 2007) (same). Moreover, we will not address a state constitutional argument unless it is separated from a federal constitutional argument at trial or on appeal. State v. Carr, 216 Ariz. 444, n. 2, 167 P.3d 131, 134 n. 2 (App. 2007); State v. Freeland, 176 Ariz. 544, 549, 863 P.2d 263, 268 (App.1993) (defendant waived new version of suppression argument made for first time on appeal absent funda-

mental error). Passing reference to "Article II, Section 8" in a motion to suppress, as here, preserves nothing for appeal.[14] See State v. Dean, 206 Ariz. 158, n. 1, 76 P.3d 429, 432 n. 1 (2003) (when party asserts violation of Arizona Constitution, but cites only Fourth Amendment authority and does not argue state constitutional analysis should differ, decision confined to Fourth Amendment); In re Leopoldo L., 209 Ariz. 249, n. 1, 99 P.3d 578, 581 n. 1 (App.2004) (same); State v. Watson, 198 Ariz. 48, n. 2, 6 P.3d 752, 756, n. 2 (App.2000) (argument that article II, § 8 renders "a man's home his castle" insufficient to preserve issue for appeal); State v. Calabrese, 157 Ariz. 189, 191, 755 P.2d 1177, 1179 (App.1988) (state constitutional objections waived if not raised in trial court).

¶ 35 Furthermore, this argument on state constitutional grounds was not made in any form in Guillen's appellate briefing to this court.[15] As a result, the state had no opportunity to respond to or otherwise brief the issue, demonstrating one of the reasons why arguments not raised by an appellant are waived on appeal. See Meiners v. Indus. Comm'n of Ariz., 213 Ariz. 536, n. 2, 145 P.3d 633, 635 n. 2 (App.2006) (court refrains from ruling on unbriefed issues to avoid surprising parties and deciding case without benefit of

13. I also disagree with the majority's views that a dog sniff "reach[es] into a home" and that the federal constitutional question is "vexingly close." But I concur with their ultimate conclusion that a canine sniff at the so-called "seams" of a home does not rise to the level of a search under the Fourth Amendment and cannot mandate suppression here. Because this case now turns on questions of state constitutional law, I will refrain from rehashing the federal discussion or highlighting how my analysis would differ. I am also unconvinced the trial court erred in concluding Mrs. Guillen's consent obviated the need to discuss the constitutionality of the dog sniff. But, because my primary dispute with the majority opinion is in its state constitutional analysis, I limit my comments to this issue.

14. The only substantive reference Guillen made to the Arizona Constitution below is a solitary sentence in his motion to suppress, which asserted: "Officer Moreno's venture onto the Defendant's property constituted a violation of Defendant's rights as protected by the 4th Amendment to the United States Constitution and Article II, Section Eight of the Arizona Constitution." Not

only did Guillen fail to argue that the Arizona Constitution would prohibit the dog sniff of his garage, he made no mention of it at the hearing before the trial court.

15. Guillen's references to the Arizona Constitution on appeal are just as scant as in the trial court. In his opening brief, Guillen simply repeats his assertion that, "Officer Moreno's venture onto Mr. Guillen's property was a violation of his rights pursuant to the U.S. Constitution, 4th Amendment and the Arizona Constitution Section 8." He does not develop this argument or even identify the portion of the Arizona Constitution on which the majority decision hinges. He provides us with the standard of review only for a Fourth Amendment violation and identifies the trial court's error as stemming from failure to find such a violation. As noted above, arguments not made on appeal are waived. See Hamblin, 217 Ariz. 481, n. 2, 176 P.3d at 51 n. 2. I find unpersuasive the majority's protracted rationale characterizing Guillen's Fourth Amendment argument as "equally germane" to a state constitutional claim that was never articulated below or on appeal. See Dean; Hardesty.

research and analysis by parties); *State v. Curry*, 187 Ariz. 623, 626–27, 931 P.2d 1133, 1136–37 (App.1996) (deciding issue raised sua sponte without benefit of supplemental briefing runs "counter to notions of procedural due process"); *see also State v. Hardesty*, 220 Ariz. 149, n. 6, 204 P.3d 407, 413 n. 6 (App.2008) (bald assertion that state constitutional rights were violated does not preserve issue on appeal), *review granted* (Ariz. Jan. 6, 2009) (No. CR–08–0244–PR); *State v. Tarkington*, 218 Ariz. 369, n. 1, 187 P.3d 94, 95 n. 1 (App.2008) (suppression argument not developed in briefs waived on appeal); *State v. Cons*, 208 Ariz. 409, ¶ 18, 94 P.3d 609, 616 (App.2004) (court of appeals disregards arguments not developed in briefs). Thus, as the state rightly urged at oral argument, this court should not decide this case on an issue that has never before been raised, argued, or briefed by the parties, either in the trial court or on appeal.[16]

¶ 36 Nonetheless, without the benefit of any briefing on a novel issue of statewide importance, the majority sua sponte reaches out to broadly reshape the law of Arizona through an expansive reading of article II, § 8 of the Arizona Constitution that I believe is contrary to our case law. The majority, however, relies on a 1604 case allowing the king's sheriff to break down the doors of a home so long as he first announced his presence, *see Semayne's Case*, 77 Eng. Rep. 194, 5 Co. Rep. 91a, 91b, 195 (K.B.), and on the dissent in an eighty-year-old federal case that does not involve an invasion of a home or even its curtilage, *see Olmstead*, 277 U.S. at 457, 475–76, 48 S.Ct. 564 (Brandeis, J., dissenting and urging Fourth Amendment should shield against telephonic wiretapping because it reveals *private details* of person's life) (emphasis added). Deriving from these cases a right of "repose" that apparently extends beyond the confines of a home out to the public walkway, my colleagues take two indisputably constitutional acts of law enforcement and find that, employed together,

they create a violation of the Arizona Constitution.

## Article II, § 8

¶ 37 The majority cites two Arizona cases in support of its proposition that, within article II, § 8, resides a previously unknown right of "tranquility and repose" that mandates today's outcome. *State v. Bolt*, 142 Ariz. 260, 263, 689 P.2d 519, 522 (1984) and *State v. Ault*, 150 Ariz. 459, 724 P.2d 545 (1986), however, are the *only* decisions that have interpreted this part of our constitution independently of its federal counterpart and determined, in a narrow factual context, that our state protections are broader. More importantly, neither supplies the validation the majority seeks.

¶ 38 Although our supreme court has interpreted article II, § 8 independently of the Fourth Amendment to the United States Constitution, it has done so narrowly and with an eye toward the federal constitution. The cases cited in the majority opinion for the proposition that Arizona's constitution affords greater protections than the Fourth Amendment both dealt with actual physical intrusions into a defendant's home. In *Bolt*, 142 Ariz. at 263, 689 P.2d at 522, police officers "secured" a residence by entering while they awaited a telephonic warrant and searching anywhere suspected co-conspirators in a drug ring might be hiding. Our supreme court first determined that federal law was not conclusive on this issue. *Id.* at 264, 689 P.2d 519. It then concluded that, absent exigent circumstances, such police action would nevertheless be unconstitutional under our state constitution. *Id.* at 264–65, 689 P.2d 519.

¶ 39 In *Ault*, the court again considered the state constitutional implications of a warrantless entry into a home after police officers entered illegally and obtained evidence that our supreme court held should be sup-

---

**16.** The majority asserts that, because this court ordered oral argument and provided a draft decision, the state had an opportunity to "develop and present" its argument. But I cannot agree that a draft decision received a few days prior to oral argument, disposing of the case on an unprecedented theory never previously raised, is comparable to a full opportunity to brief the issue. And, the rule permitting the filing of supplemental authorities, which the state provided, does not permit a party to make legal arguments or expand the scope of its briefs. Ariz. R.Crim. P. 31.22.

pressed on state constitutional grounds. *Id.* at 462–63, 465–66, 724 P.2d 545. In deciding the case independently of the United States Constitution, the court nonetheless stated it "believe[d] that the Supreme Court would require suppression of this evidence under the [F]ourth [A]mendment" as well. *Id.* at 466, 724 P.2d 545.

¶ 40 It is true that, in some circumstances, our constitution may provide more protection than does the federal constitution, *see State v. Allen,* 216 Ariz. 320, ¶ 28, 166 P.3d 111, 118 (App.2007) (state constitution provides additional protection against warrantless home entry), *cert. denied,* —— U.S. ——, 129 S.Ct. 70, 172 L.Ed.2d 27 (2008), and Arizona courts have the right to interpret our constitution independently, *see Turley,* 48 Ariz. at 70–71, 59 P.2d at 316–17. But today's ruling radically departs from our supreme court's independent-state-constitutional analysis. In *Bolt* and *Ault,* our supreme court decided matters on which federal authority was silent or inconclusive and attempted to harmonize Arizona and federal law. Here, the majority has identified the likely outcome under federal analysis and made the affirmative decision to reject it.

¶ 41 Not only does the majority depart from our traditional deference to federal search-and-seizure authority, it deviates substantially from Arizona constitutional law. "[T]he right to privacy afforded by [a]rticle [II, § ] 8 has not resulted in more cases being resolved on independent and adequate state grounds ... because, except in the home search context, [this provision] has historically been construed as imposing limits on search and seizure consistent with the prohibitions of the Fourth Amendment." *State v. Juarez,* 203 Ariz. 441, ¶ 15, 55 P.3d 784, 788 (App.2002). Although the majority relies on *Bolt* and *Ault,* the facts of those cases bear no resemblance to the facts here. In *Bolt,* police officers crossed the threshold into a suspect's home without a warrant and searched every room and closet for people and evidence. 142 Ariz. at 263, 689 P.2d at

522. *Ault* involved a similar unwarranted entry, even over the suspect's refusal to admit the officers and his repeated objections to their entering his home. 150 Ariz. at 462, 724 P.2d at 548. Such intrusive acts are not involved in this case.

¶ 42 Furthermore, even assuming there is a latent right of "tranquility and repose" in the Arizona Constitution, it is not readily apparent that an officer's walking a dog past a garage, when the occupant is not even home, and the dog's doing nothing more than sniffing in an area open to anyone, would necessarily "disrupt" these intangible interests.[17] *Cf. People v. Caballes,* 221 Ill.2d 282, 303 Ill.Dec. 128, 851 N.E.2d 26, 54 (2006) ("dog sniff will not result in the slightest touching of the individual," so privacy concerns not implicated). The majority disagrees, asserting that the presence of a uniformed officer with a dog outside a person's home is "reasonably perceive[d] ... as an unsettling and embarrassing event," either at the time or after the fact. Indeed, unless summoned by the resident, law enforcement officers' unexpected presence at one's home, even if for a "benign" reason, in·itself is unsettling and potentially embarrassing, but this does not make it unconstitutional. If a uniformed, armed police officer's standing on the doorstep is constitutionally permissible, it is difficult to see how the addition of a police dog transforms the situation into one so distressing that our constitution cannot countenance it. And the risk of a dog's returning a false positive response resulting in a search warrant is not a risk unique to dog sniffs, but one society faces and accepts every day. Unfortunately, any criminal investigation can involve the risk of bad information or incorrect inferences leading to the issuance of a search warrant for an innocent person's home.

¶ 43 As the majority repeatedly concedes, "[o]ur constitutional provisions were intended to give our citizens a sense of security *in their homes ....*" *Bolt,* 142 Ariz. at 265, 689

---

**17.** To the extent the majority invokes an Orwellian specter of "indiscriminate canine sweeps," we need not consider this parade of horribles that is not before the court today nor a likely law enforcement technique. The fact is, under the law as it currently exists, at least until today's majority opinion, such sweeps would be neither unconstitutional nor prohibited by any law. But roving police dogs randomly sniffing Arizona homes and neighborhoods have yet to materialize.

P.2d at 524 (emphasis added). The majority opinion emphasizes the general "sense of security" our constitution provides, but downplays that this extra protection only applies "in [citizens'] homes." Quite simply, police officers did not enter Guillen's home. And by walking the dog past the garage, the officers did not "probe" the home as they neither gathered, tried to gather, nor even had the possibility of gathering any evidence or information about the home in which Guillen would have had a protected privacy interest. *See Caballes*, 543 U.S. at 406, 409–10, 125 S.Ct. 834 (dog sniff discloses only the presence or absence of contraband in which person has no privacy interest).

### Privacy Interests Outside the Home

¶ 44 Our case law illustrates that the areas outside a home are not generally considered private when they are accessible or partially accessible to the public, an assessment that does not change in the presence of law enforcement officers, even those engaged in police business. Peace officers can, without violating an individual's privacy interests, enter a walkway or a driveway to a home. *See Baker v. Clover*, 177 Ariz. 37, 39, 864 P.2d 1069, 1071 (App.1993) (no reasonable expectation of privacy on property adjacent to residence including threshold of home, driveway, or semiprivate walkway). Officers may constitutionally stand outside the door of an apartment and perceive the odors emanating from within. *See State v. Kosman*, 181 Ariz. 487, 490, 892 P.2d 207, 210 (App.1995) (defendant has no privacy interest in area around apartment door, where officers could smell odor of marijuana, regardless of their reason for being outside door). They may gaze into a fenced backyard from the home of a neighbor who enjoys an unobstructed view. *See State v. Platt*, 130 Ariz. 570, 572–73, 637 P.2d 1073, 1075–76 (App.1981) (no reasonable expectation of privacy in backyard totally visible and accessible from neighbor's backyard that police had permission to enter). When a

backyard is unfenced, police may walk onto the property and investigate a carport located in the rear. *See State v. Lopez*, 115 Ariz. 40, 42, 563 P.2d 295, 297 (App.1976) (no reasonable expectation of privacy with respect to marijuana odor emanating from carport in rear yard). Given the latitude police officers have, like any other member of the public, to enter the curtilage of a home, walk on a semiprivate walkway to the front door, linger outside the front door, and walk into an unfenced backyard to a rear carport, all without violating any reasonable expectations of privacy, I find it illogical to nevertheless conclude such an expectation arises if an officer is accompanied by a dog.

### Dog Sniffs

¶ 45 The addition of a trained narcotics-detection dog to the equation does not change anything. No Arizona case has recognized or suggested there is any disruption, fear, or intimidation inherent in a situation when a police drug dog is present. And our courts have expressly endorsed the legitimacy of their use. *See In re Twenty–Four Thousand Dollars*, 217 Ariz. 199, ¶ 29, 171 P.3d 1240, 1247 (App.2007) (recognizing "scientific validity of an alert by a properly trained detection dog").[18] Furthermore, our supreme court has held that dog sniffs are not searches and that odors are akin to items in plain view. *State v. Morrow*, 128 Ariz. 309, 312–13, 625 P.2d 898, 901–02 (1981).

¶ 46 In *Morrow*, a customs officer used his trained narcotics dog to screen luggage at Tucson International Airport. At Morrow's bag, the dog reacted, and a subsequent search revealed the bag contained marijuana. *Id.* at 311, 625 P.2d 898. In upholding Morrow's conviction, our supreme court held that odor emanations are exposed to the public and not subject to Fourth Amendment search and seizure analysis. *Id.* at 313, 625 P.2d 898. "In the case of a dog, superior olfactory senses make it easier to detect certain odors. . . . That does not change the fact

---

18. Somewhat inconsistently, the majority repeatedly analogizes dog sniffs to the sophisticated electronic heat sensors in *Kyllo* but also invokes Justice Souter's *Caballes* dissent, describing dog sniffs as unreliable. 543 U.S. at 411–12, 125 S.Ct. 834 (Souter, J., dissenting).

As noted above, our case law supports the view that dog sniffs are scientifically valid and any suggestion that they are otherwise is not based on any study or evidence in the record before us.

that what the dog smells *is in the area* surrounding the bag and that is not a search of the bag itself." *Id.* at 313, 625 P.2d 898 (emphasis added). A dog's sniffing in a place where it is entitled to be is "akin to the 'plain view' doctrine and is in 'plain smell.' The sniffing of the dog [i]s not a search." *Id.* Importantly, the holding in *Morrow* did not turn on the privacy interest in the bag itself but on the odors emanating from the bag into the air. Thus, that the Arizona Constitution may afford the interior of a garage greater protection than luggage at an airport has no bearing on *Morrow's* applicability to the present case. *See State v. Teagle*, 217 Ariz. 17, n. 3, 170 P.3d 266, 271 n. 3 (App.2007) ("Except in cases involving 'unlawful' warrantless home entries, the right of privacy afforded by [a]rticle [II, § ] 8, has not been expanded beyond that provided by the Fourth Amendment."). An odor and its source are not one and the same, and scent particles, once released into the air, do not retain whatever protected status their source may enjoy. *See, e.g., Kosman*, 181 Ariz. at 490, 892 P.2d at 210 (no privacy interest in odor of marijuana smelled outside apartment door).

¶ 47 The majority's contention that *Kyllo* supersedes *Morrow's* holding is flawed. In *Kyllo* the Supreme Court rejected the government's argument that, because the heat sensors only detected energy that had permeated walls and left the home, they did not actually look into the home, but rather only detected the heat present outside the home. 533 U.S. at 35–36, 121 S.Ct. 2038. The Court rejected this distinction because the radiating heat disclosed information about areas and details inside a home, information which it found to be private and protected. *Id.* at 37–38, 121 S.Ct. 2038. But a dog sniff does not expose private information that would otherwise be hidden from view. *See Caballes*, 543 U.S. at 406, 409–10, 125 S.Ct. 834. If a dog sniff could detect anything more than the likely presence of contraband inside a concealed area based on scents detectable out-

side, perhaps *Kyllo* would undercut *Morrow's* logic. *See Caballes*, 543 U.S. at 409–10, 125 S.Ct. 834. But that is not the case. And, as the majority notes, later case law governs earlier decisions. *Caballes* was decided after *Kyllo*, and the Court expressly considered *Kyllo's* holding and reasoning, *id.* at 409–10, 125 S.Ct. 834, in determining that a drug dog's sniff of the outside of a vehicle—an event that necessarily and logically involved scent emanations leaving a protected area as in *Morrow*—was not a search. *Id.; see also United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (dog sniff of luggage not a search), *cited with approval in Caballes*, 543 U.S. at 409, 125 S.Ct. 834. Because *Morrow* is consistent with *Caballes*, which, in turn, is consistent with *Kyllo*, the majority erroneously discounts *Morrow's* holding and precedential authority.

¶ 48 In sum, because our supreme court has adopted a "plain smell" standard, there is no privacy interest in the odors wafting from a constitutionally protected space, *see Morrow*, 128 Ariz. at 313, 625 P.2d at 902; *Kosman*, 181 Ariz. at 490, 892 P.2d at 210, regardless of whether such odors are apparent to the human nose or can only be detected by the superior senses of a canine, *see Morrow*, 128 Ariz. at 312–13, 625 P.2d at 901–02. Thus, the only way the canine sniff of Guillen's garage can be deemed an unconstitutional "search" is if Guillen had a reasonable expectation of privacy in the exterior of his garage, but existing case law establishes he did not. It seems illogical, then, to conclude that the convergence of two constitutional events—the presence of an officer and the presence of a drug dog, in a place each is entitled to be—would, together, amount to a violation of our state constitution.

**Other State Cases**

¶ 49 The majority's reliance on cases from other jurisdictions to bolster its conclusion appears misplaced for several reasons.[19] All

19. Contrary to the majority's suggestion, the conclusion they reach today does not appear to be the majority viewpoint among other states. The majority has identified three cases that support its conclusion on this particular issue. But there

are at least three other states that have found, under their constitutions, a dog's sniffing the area around a home is not a search. *Stabler v. State*, 990 So.2d 1258, 1260, 1261 (Fla.Dist.Ct. App.2008) (dog sniff at front door not search);

cases cited by the majority are derived from different state law heritages than our own, and many do not deal with dog sniffs outside a home but, rather, with sniffs in general or in other contexts about which Arizona law is clear.

¶ 50 First, out-of-state cases that do not deal specifically with dog sniffs outside a residence should be disregarded. These references are irrelevant because their holdings are contrary to established Arizona law. *Boylan,* the Colorado case cited by the majority, not only does not specifically consider the issue of a dog sniff around a home, but it also relies on Colorado case law holding that a dog sniff is a search and requiring reasonable suspicion to conduct one. 854 P.2d at 808–09. Similarly, in *Johnston,* a Pennsylvania case involving a storage facility, the court determined a dog sniff is a search requiring reasonable suspicion. 530 A.2d at 79–80. Likewise, Alaska's decision in *Pooley* also concluded that a dog sniff is a search. 705 P.2d at 1311. As noted above, Arizona does not regard a dog sniff as a search, *see Morrow,* 128 Ariz. at 312–13, 625 P.2d at 901–02, and thus does not require reasonable suspicion before one is performed. *See also State v. Box,* 205 Ariz. 492, ¶ 15, 73 P.3d 623, 627–28 (App.2003) (no reasonable suspicion required to conduct dog sniff of car during traffic stop). The New Hampshire and Minnesota cases likewise did not consider a dog sniff on the curtilage of a home but, rather, the sniff of a car in the course of a traffic stop. *See Pellicci,* 580 A.2d at 712, 716; *Wiegand,* 645 N.W.2d at 135. Again, Arizona case law does not require reasonable suspicion for this, *see Teagle,* 217 Ariz. 17, n.

7, 170 P.3d at 276 n. 7; *Box,* 205 Ariz. 492, ¶ 15, 73 P.3d at 627–28; *State v. Weinstein,* 190 Ariz. 306, 310, 947 P.2d 880, 884 (App. 1997); *State v. Paredes,* 167 Ariz. 609, 613, 810 P.2d 607, 611 (App.1991); *State v. Martinez,* 26 Ariz.App. 210, 212, 547 P.2d 62, 64, *aff'd,* 113 Ariz. 345, 554 P.2d 1272 (1976), and, unless the United States Supreme Court were to require reasonable suspicion in such a case, our state constitution would not require it. *See State v. Reyna,* 205 Ariz. 374, ¶ 14, 71 P.3d 366, 369 (App.2003) ("Our supreme court long ago held that [a]rticle [II, § ] 8 of the Arizona Constitution 'is of the same general effect and purpose as the Fourth Amendment' and that the decisions concerning the scope of allowable vehicle searches under the federal constitution are 'well on point ....' "), *quoting Malmin v. State,* 30 Ariz. at 261, 246 P. at 549.

¶ 51 The cited cases involving dog sniffs near the perimeter of a residence are more on point factually, but are nevertheless unavailing because they were derived from state law wholly different from our own. For example, in citing *Dearman,* the majority notes it was decided under a constitutional provision identical to our article II, § 8. On these points, Washington's and Arizona's constitutions, however, are like identical twins separated at birth, and our constitutional law has not developed in a similar way. *See Juarez,* 203 Ariz. 441, ¶ 22, 55 P.3d at 789–90 (describing different evolutions of article II, § 8 and Washington's analogous provision). *Dearman* relied heavily on existing Washington case law that reached an opposite conclusion from our supreme court's conclusion in *Morrow,* rejecting a "plain sniff" argument.[20]

*People v. Jones,* 279 Mich.App. 86, 755 N.W.2d 224, 227–29 (2008) (same); *Rodriguez v. State,* 106 S.W.3d 224, 230 (Tex.App.2003) (sniff outside residence not search). Moreover, a large number of states have not and may never reach this question because they have concluded that dog sniffs in general are simply not searches under their own constitutions. *See People v. Mayberry,* 31 Cal.3d 335, 337, 182 Cal.Rptr. 617, 644 P.2d 810 (1982) (dog sniff not search); *O'Keefe v. State,* 189 Ga.App. 519, 376 S.E.2d 406, 412 (1988) (because no privacy interest in odors escaping car, dog sniff not search); *People v. Caballes,* 221 Ill.2d 282, 303 Ill.Dec. 128, 851 N.E.2d 26, 46 (2006) (dog sniff not search); *Padilla v. State,* 180 Md.App. 210, 949 A.2d 68, 82 (2008) (dog sniff of motor vehicle does not re-

quire reasonable suspicion); *State v. Cancel,* 256 N.J.Super. 430, 607 A.2d 199, 202–03 (App.Div. 1992) (sniff of luggage not search because not "rummag[ing]" through personal belongings); *State v. Villanueva,* 110 N.M. 359, 796 P.2d 252, 256 (Ct.App.1990) (sniff of luggage not search because no right of privacy in airspace around object); *State v. Waldroup,* 100 Ohio App.3d 508, 654 N.E.2d 390, 394 (1995) (dog sniff of vehicle not search); *State v. Smith,* 327 Or. 366, 963 P.2d 642, 644, 647 (1998) (dog sniff of storage facility not search).

**20.** We have no authority to overrule decisions of our supreme court and are bound by them. *See City of Phoenix v. Leroy's Liquors, Inc.,* 177 Ariz.

962 P.2d at 853–54. Similarly, in concluding police officers needed reasonable suspicion to conduct a dog sniff in an apartment hallway, Nebraska found a legitimate expectation of privacy in the corridor, *Ortiz*, 600 N.W.2d at 817, a finding at odds with our decision in *Kosman*. 181 Ariz. at 490, 892 P.2d at 210. Likewise, in holding its constitution required reasonable suspicion to conduct a dog sniff outside an apartment, New York concluded both that the dog sniff was a search and that there was a reasonable expectation of privacy outside the apartment, both of which holdings conflict with Arizona law. *See Dunn*, 563 N.Y.S.2d 388, 564 N.E.2d at 1058.

**Legitimacy of Privacy Interest**

¶ 52 Even assuming a dog sniff could be characterized as a cognizable event under Arizona's constitution, Guillen could not obtain relief unless the officers had invaded a legitimate privacy interest. As noted above, although our constitution can offer broader protection than the federal constitution in some circumstances, "Arizona courts have consistently applied the Fourth Amendment's 'legitimate expectation of privacy' requirement when determining unlawful search or seizure claims made pursuant to [a]rticle [II, § ] 8." *Juarez*, 203 Ariz. 441, ¶ 16, 55 P.3d at 788. For an expectation of privacy to be constitutionally protected, "a person must show both an 'actual (subjective) expectation of privacy' and that the expectation is one that society is prepared to recognize as 'justifiable' under the circumstances." *Allen*, 216 Ariz. 320, ¶ 13, 166 P.3d at 114, *quoting Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *see also Juarez*, 203 Ariz. 441, ¶ 16, 55 P.3d at 785 (defendant has burden of showing privacy interest). Guillen cannot make either part of the necessary showing.

¶ 53 The record does not reflect that Guillen manifested any subjective expectation of privacy in the area outside his garage. The front entrance to the home was accessible by the driveway. It faced the street and there were no fences or walls to inhibit direct and open approach. The driveway on which Officer Moreno walked led "directly to the garage," and a sidewalk continued to the front door. Guillen had erected no barriers or signs prohibiting entry to the property. He did not testify at the suppression hearing or otherwise offer any evidence that he regarded the area surrounding his garage as private rather than public or semipublic space.

¶ 54 Not only did Guillen not demonstrate a subjective interest in privacy, he has failed to articulate a privacy interest society is prepared to recognize. "A 'legitimate' expectation of privacy is not synonymous with a subjective expectation of not being discovered" but is instead determined through reference to property law and social understandings of property. *State v. Johnson*, 132 Ariz. 5, 7, 643 P.2d 708, 710 (App.1981). Fourth Amendment jurisprudence consistently holds that society is unwilling to recognize as reasonable a privacy interest in the areas surrounding a home. *See United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (no expectation of privacy in doorway exposed to "public view, speech, hearing, and touch"); *State v. Girdler*, 138 Ariz. 482, 486–87, 675 P.2d 1301, 1305–06 (1983) (no expectation of privacy in generally public area between back door of mobile home and place where vehicle parked); *State v. Caldwell*, 20 Ariz.App. 331, 335, 512 P.2d 863, 867 (1973) (no expectation of privacy in boxes found "in an area where someone from the general public was apt to wander"); *cf. State v. Krantz*, 174 Ariz. 211, 215–16, 848 P.2d 296, 300–01 (App.1992) (broader protection of article II, § 8 will not render unreasonable search or seizure found reasonable under well-developed case law). Therefore, even if Arizona precedent were abandoned and a dog sniff effectively treated as a search for purposes of our constitution, the majority's theory is still contrary to Arizona case law.

**Conclusion**

¶ 55 Since the time Arizona was a new state, it has been a fundamental principle of

---

375, 378, 868 P.2d 958, 961 (App.1993) (court of appeals bound by decisions of our supreme court).

our jurisprudence that when the jurisdiction of the court "is invoked ... it is [the court's] duty to interpret and construe the law as [it] find[s] it." *McCall v. State,* 18 Ariz. 408, 417, 161 P. 893, 895 (1916). In our case law, it is well established that the outside of a home enjoys no additional privacy protections under the state constitution than it does under the Fourth Amendment. It is also well established that mere dog sniffs are not searches in Arizona. And equally well established is that privacy interests in the curtilage or publicly accessible area outside a doorway or garage are not ones society is prepared to recognize as reasonable. I cannot, then, in keeping with our duty to apply the law as we find it, join in the conclusion the majority announces. To the extent the majority opinion is contrary to pronouncements by our supreme court, we have no power to disagree. And, to the extent the majority disregards the substantial precedent of Arizona in reaching its result, its decision ought not stand. *See Town of Gilbert Prosecutor's Office v. Downie ex. rel. County of Maricopa,* 218 Ariz. 466, ¶ 45, 189 P.3d 393, 402 (2008) (McGregor, J., dissenting) ("When we ignore precedent without a compelling reason for doing so, we undermine public trust in the integrity of the law.").

¶ 56 In sum, because this issue was neither properly raised nor argued below or on appeal, because I find no Arizona precedent for reading our constitution as the majority does today, and because I believe our existing case law commands an opposite result, I respectfully dissent and would affirm the trial court's denial of Guillen's motion to suppress the marijuana and other evidence found in his garage.